Elizabeth Hogan and Mary Burke, Appellees, v. City of Chicago, Appellant.

Gen. No. 41,889.

Opinion filed June 16, 1943.

Barnet Hodes, Corporation Counsel, for appellant; James A. Velde, Adam E. Patterson and Lionel J. Berg, Assistant Corporation Counsel, of counsel.

Augustine J. Bowe and William J. Bowe, both of Chicago, for appellees; John D. Casey, of Chicago, of counsel.

Mr. Presiding Justice Sullivan delivered the opinion of the court.

Plaintiffs, Elizabeth Hogan and Mary Burke, brought separate actions against defendant, City of Chicago, to recover damages for personal injuries. The injuries were alleged to have been sustained by plaintiffs when the automobile in which they were riding was struck by an automobile owned and operated by one Sam Jones, an employee of the City of Chicago. The actions were consolidated in the trial court. The cause was tried before the court and jury and a verdict was returned finding the defendant guilty and assessing plaintiffs' damages at $2,000 each. Defendant made no motion for a new trial. Its motion for a directed verdict made at the close of all the evidence, upon which the trial court reserved its ruling, and its motion for judgment notwithstanding the verdict were overruled. Judgment was entered upon the verdict. Defendant appeals from said judgment. Plaintiffs filed cross-appeals on the ground that the damages allowed were inadequate but same were waived on oral argument.

The only question presented for determination is whether the trial court erred in denying defendant's motions for a directed verdict and for judgment notwithstanding the verdict. Plaintiffs insist that under the facts in this case the rule of *respondeat superior* applies, imposing liability upon defendant.' It must be assumed for the purposes of this appeal that plaintiffs were free from contributory negligence and that Jones was guilty of negligence in the operation of his automobile.

Sam Jones was a laborer employed by the City of Chicago in connection with garbage removal. In be-

ginning his work each morning it was his duty to report to the 19th ward office, 8559 Vincennes avenue, for his work assignment for the day. He was paid on a daily basis and "his day began at eight in the morning and ran for eight hours exclusive of lunch." On the morning of the accident involved herein, November 23, 1938, Jones reported for work at said ward office about 7:45 a. m. Fifty or more other men also reported there at the same time for their work assignments. Three laborers and a foreman were assigned as a crew to each of a number of trucks used to haul garbage and each crew, which also included a truck driver with his truck, was ordered to go to a certain loading point, where it would proceed with its garbage removal work for the day. After receiving their assignments from the ward superintendent some of the men went to their places of work in the trucks designated for their particular crews and others in their own automobiles or in automobiles in which they were invited to ride by some of the other laborers or foremen. On the morning the accident occurred the starting point to load garbage for Jones' crew was at 93rd and Loomis streets which was about two miles southwest of the ward office and he, his foreman and the two other laborers assigned to his crew left the ward office in Jones' car at "approximately seven to ten minutes after eight." The city did not hire or rent Jones' car and paid him nothing for the use of same.

Michael O'Malley, the ward superintendent of the 19th ward, who had general supervision in that ward over the men and trucks employed by the city to collect and remove garbage, testified that the foremen and laborers commenced their work each day by reporting to him at his office at the ward yard "at approximately a quarter of eight in the morning"; that from that time on "I give them orders"; that after assigning the laborers each day to the districts

in which they were to work, he gave each foreman the names of the laborers who were to work under him; that "those who have automobiles, they may be foremen or may be laborers, usually conveyed [went] by automobile, and others who have no automobiles are taken to the loading point by truck"; that he had frequently seen the laborers and foremen going from the ward office to their various loading stations in private automobiles and that had been the habit and custom; that "the only thing I was concerned with was about the men getting to the loading point in order to make the required number of loads"; that prior to the date of the accident in question he "noticed Jones use his car . . . as a matter of fact, I noticed it on that particular morning"; and that he had never given any instructions to the foremen or laborers under his supervision with respect to the use of private automobiles and that he did not know of anyone in authority who had.

O'Malley further testified that the majority of the laborers and foremen went to their loading stations in private automobiles; that "the fact that our particular ward is so large an area, it is difficult for our laborers to get to their loading point unless they have an automobile . . . our ward is sixteen square miles, and there is such a small amount of equipment, they find it very convenient, and of course, we do not object, because it was convenient to us . . . they got to their loading point much quicker . . . they couldn't start to work until the truck got there . . . there are times they get there ahead and remove the garbage from the concrete box so it was easier to shovel on . . . sometimes they go ahead to prepare the load"; and that from the time the men in Jones' garbage collecting crew left the ward yard in his car to go to their assigned loading station their foreman was in an "immediate position of authority over them."

O'Malley also testified that there was no departmental rule on November 23, 1938 that the laborers were to travel in the garbage trucks from the ward office to the points where they were to start loading said trucks and that it was customary for Jones to drive his own automobile from the ward yard to his loading station; and that he (O'Malley) did not have the authority to direct the garbage handlers as to what means of transportation to use in going to their loading stations.

Joseph Parrington testified that he was a section foreman for the City of Chicago and that Sam Jones, two other laborers and a truck driver were in his crew; that the men reported for work "every morning at the ward office" to get their assignments for the day from the ward superintendent or the clerk; that "he rode in Sam Jones' car that morning along with the other two laborers"; and that he had theretofore ridden with Jones in his automobile about 12 or 15 times to their assigned garbage loading stations.

Defendant's theory as stated in its brief is that "Sam Jones was the owner of and operating his automobile for his own personal convenience at the time and place of the plaintiffs' injuries and was not then acting as the servant of the defendant; that the defendant had no control over the operation of Jones' automobile at the time the injuries were sustained; and that therefore the defendant is not liable to the plaintiffs."

Plaintiffs' theory is that "the evidence does show that the plaintiffs' injuries resulted from an act done by Jones in the course of his employment and under the control of the defendant"; that "the defendant was not entitled to a directed verdict"; and that "the evidence presented a question for the jury."

The courts have applied the doctrine of *respondeat superior* to widely varying factual situations. Each case must depend upon its own peculiar facts and

generally all features of the relationship of the parties must be construed together. The general rule is that a party injured by the negligence of another must seek his remedy against the person who caused the injury, since such person is alone liable. To this general rule the cases of master and servant and principal and agent are exceptions and the negligence of the servant or agent is imputable to the master or principal, but to bring the case within the exception it is necessary to show that the relation of master and servant or principal and agent exists between the person at fault and the one sought to be charged for the result of the wrong, and the relation must exist at the time and in respect to the particular transaction out of which the injury arose. (*Mosby v. Kimball,* 345 Ill. 420.)

Defendant asserts that the doctrine of *respondeat superior* does not apply to it because of the following undisputed facts: Jones was employed as a laborer by the City of Chicago in connection with garbage removal and he was not employed to drive a car. No part of the expense of operating Jones' automobile was paid by the city. Jones' car was not hired or rented by the city.

It is argued from these facts that neither Jones nor his automobile was under defendant's control or direction at the time and place of the accident, that he was not defendant's servant when the collision occurred, that he used his car for his own personal convenience and that therefore no liability may be imposed upon the city by reason of Jones' negligent conduct in the operation of his automobile.

Plaintiffs rely on the following factors in support of their contention that Jones was acting as defendant's servant and within the scope of his employment when the collision occurred and that he was authorized by defendant to drive his car at that time and place: His work day began at 8 a. m. His first duty in con-

nection with his employment was to report to the ward superintendent at the ward office to get his assignment for the day. Having received said assignment his next duty was to get to the point where he was to start to load garbage. The majority of the foremen and laborers, including Jones, customarily drove to their first loading station in their own cars or cars of fellow workmen. When the ward superintendent gave Jones his assignment he knew that Jones was going to drive to his designated loading point in his own car. Jones' assignment by O'Malley, the ward superintendent, coupled with the latter's knowledge that Jones was going to drive to his loading station in his own automobile on the day in question, as he had done on many previous occasions, was an implied assent by O'Malley to the use of said automobile for that purpose and equivalent to a direction to do so. The area of the 19th ward is so large, according to O'Malley, that "it is difficult for our laborers to get to their loading points unless they have an automobile . . . it was convenient to us . . . they got to their loading points much quicker." From the time Jones drove his car from the ward yard his foreman who was riding with him was in an "immediate position of authority" over him. Jones was driving his car over the most direct route from the ward yard to his loading station and was within a few blocks of same when the accident happened. Jones' work day having commenced at 8 a. m. he was employed on the city's time both before he left the ward yard and as he drove his car from the ward yard until the collision occurred.

While it is true that Jones was employed primarily to shovel garbage onto the city's trucks and not to drive an automobile; it is also true that under defendant's management of those employed in garbage removal he was not permitted to go directly from his home to his garbage loading station. If he had been so

permitted and if in going directly from his home to his garbage loading station he was driving his automobile solely for his own convenience when the accident happened, no liability could be imposed upon the city. But under the city's system then in effect Jones was required to report first to the ward office before 8 a. m. to get his assignment for the day. Defendant urges that from the time Jones and his fellow laborers received their assignments it was immaterial to the city how they reached their loading stations—they could walk, go by street car, ride on a garbage truck or ride with others or in their own automobiles if they saw fit to do so for their own convenience. The testimony of the ward superintendent sufficiently answers defendant's contention in this regard. He excluded riding by the men to their loading stations on street cars as being too slow. That necessarily excluded walking which would be even slower. That left Jones two alternatives—to ride on a garbage truck or to drive his own automobile. As heretofore shown it was the custom and practice for Jones and the others who had automobiles to drive to their loading stations in same and the ward superintendent permitted and encouraged them to do so.

If Jones was authorized by the city through its ward superintendent, either directly or by implication, to drive his car to his loading station on the morning the collision occurred it necessarily follows that he was acting within the course or scope of his employment in so doing. Therefore the controlling element in this case is whether Jones had express or implied authority to use his own car on the morning in question to get to his loading station and that presented a question of fact for the jury.

No case has been cited and we have been unable to find one in which the Supreme Court of this State has considered or determined the precise question involved herein where the facts were at all similar to

the facts here. While there is some confusion and conflict in the authorities of other jurisdictions on the question of the liability of an employer for the negligence of his employee in the operation of his own car in the business of the employer, in our opinion American Jurisprudence states the rule applicable to the facts herein, which rule, we think, correctly reflects the prevailing opinion of American courts on this subject. This rule is as follows:

"The mere fact that an employee uses his own automobile in the business of the employer does not make the latter liable under the doctrine of *respondeat superior* for injuries inflicted by such employee in the operation of the automobile. *If, however, the other circumstances involved in the case are consistent with, or require, the inference that the activity in which the servant was engaged at the time of the tort complained of, and in which he was using his own car or one which he had hired, was within the scope of his employment, the person injured may recover from the employer, if the servant's use of the automobile or other vehicle was authorized, either expressly or impliedly. Thus, if an employee, with the knowledge and assent of the employer, repeatedly uses an automobile, not owned by the employer, in the latter's business, the employer will be held to have impliedly authorized its use and to be liable for negligence in connection therewith, but the mere fact that an automobile was used on one occasion, unaccompanied by any evidence of other similar acts, does not justify any inference that the employee was later authorized to use the machine upon the employer's business.*" (5 Am. Jur. 728, 729, par. 393.) (Italics ours.)

The majority view on this question is also stated under the heading "Employer's liability for negligence of employee in driving his own car or other vehicle in employer's business," in the "Annotation" in 112 A. L. R., at page 921:

"If the other circumstances involved in the case are consistent with or require the inference that the activity in which the servant was engaged at the time of the tort complained of was within the scope of his employment, the mere fact that the automobile or other vehicle used by him, and which occasioned the injury, belonged to or was hired by him, will not preclude the person injured from recovering from the employer, if the servant's use of the vehicle was authorized, either expressly or impliedly, by the employer."

In *Miller v. Metropolitan Life Ins. Co.*, 134 Ohio St. 289, it was held at pp. 293 and 294:

"With respect to the principal's liability for the torts of his agent, the following test is generally applied: First, was the act, out of which the tort arose, one which has been authorized, expressly or by implication, by the employer; second, was the act, out of which the tort arose, one performed in the course and scope of employment? If these questions are answered in the affirmative, the doctrine of *respondeat superior* is applicable and liability attaches to the employer; otherwise not.

"The question whether Evans had authority, express or implied, to use his own automobile in the discharge of his duties is one of fact for the jury. From the evidence introduced, it is possible for different minds reasonably to draw different conclusions. Consequently, submission of this question to the jury was proper. *Durbin v. Humphrey Co.*, 133 Ohio St. 367. Though the record does not disclose an express authorization to Evans to use his automobile in his work, it does disclose facts and circumstances from which a jury may properly find implied authorization.

"Risley, the district manager, testified that he gave Evans no authority to use his automobile; that consent was neither sought nor given; that he knew that Evans sometimes used an automobile in connection with his work, but that he expressed no objection

thereto. Thus, use of an automobile, though not expressly required, was nevertheless allowed; though not expressly authorized, was not expressly forbidden. Its use continued and acquiescence continued with it. Continued acquiescence in the performance of a previously unauthorized act ripens into tacit approval and authorization.

"Where an insurance solicitor uses his automobile in his work, with the knowledge of his employer, repetitious use by the solicitor, without express disapproval by the employer, will be treated as a use with implied authority."

*Department of Public Works v. Industrial Accident Comm.,* 128 Cal. App. 128, 16 P. (2d) 777, while a workmen's compensation case, involved facts practically identical with the facts in the instant case. There the employee, Dreyer, was a highway laborer. He was required to report each morning at a toll house where he received orders as to what point on the highway he was to work. The employer had trucks that left the toll house to go to the various working points and some of the laborers rode in said trucks. Other laborers customarily rode from the toll house to their working places in their own cars and there was no objection from the foreman to their doing so or instructions to the contrary. On the morning of the accident Dreyer reported to the toll house and received orders to go to a certain point on a highway. He got in his car and his foreman got in with him as a passenger and they started to drive on the road to the place where the work was to be done. On the way the automobile ran off the road and Dreyer was killed. His widow claimed compensation from the employer on the ground that the accident occurred in the course of his employment. The employer contended that the accident occurred while Dreyer was en route to work and not while he was actually engaged in the course of his employment, and that he was driv-

ing his own machine, the operation of which the employer had no right to control. In holding that the accident did occur in the course of the servant's employment the court pointed out that from the time Dreyer reported at the toll house he was under the direction of his employer's superintendent and foreman. In that case the court said (at 128 Cal. App. 131):

"While it is true that the employer made provision for workmen to ride to the point of actual service on trucks which were used in the highway work, this means of conveyance was not required of the workmen. Some of them drove to the place of employment in their own machines. The foreman was aware of this custom and acquiesced in the practice. On the morning of the accident the assistant foreman, who was in charge of the day's work, consented to Dreyer's offer to drive them on to the point where they were to commence clearing the highway. He actually rode with Dreyer. Since the day's work had begun, and Dreyer was then under the supervision of the foreman, he was actually subject to directions from Clark. It may not be said they were not engaged in the course of employment merely because the shoveling of snow had not actually commenced. It would be just as reasonable to assert they were not engaged in the course of employment during intervals while they were traveling, either by machine or on foot, from one point where snow or debris had accumulated to another. They were employed to clear the highway on the mountain grade above the toll-house. The section of the highway was their field of employment. The Department of Public Works may not deny liability merely because Dreyer was going in his own machine from one point of service to another in the field of his employment. Dreyer was encouraged to do this. The employer acquiesced in this particular use of the owner's machine.

"This acquiescence in the means of transportation is equivalent to directing it to be done. By approval

of the employer it became an authorized alternative means of traveling from one point of service to another in the general field of employment. Under the circumstances of this case it would be unreasonable to say that Dreyer was not actually engaged in the course of his employment at the time of the accident which caused his death.''

In *Kohl v. Albert Lifson & Sons,* 128 N. J. L. 373, 25 A. (2d) 925, where the facts were somewhat similar to the facts here, it was said at pp. 926 and 927, of the last mentioned report:

''The test is whether the employee is on the employer's business at the time. 5 Am. Jur. 709, sec. 373; 729 sec. 393. Whether the car is the property of the employer or not is immaterial if its use was authorized by the employer, as here it was. *Wesolowski v. John Hancock Mutual Life Ins. Co.,* 308 Pa. 117, 162 Atl. 166, 87 A. L. R. 783, 787; 17 A. L. R. 621; 54 A. L. R. 627. See, also, *Warne v. Moore,* 86 N. J. L. 710, 94 Atl. 307; *Auer v. Sinclair Refining Co.,* 103 N. J. L. 372, 376, 137 Atl. 555, 54 A. L. R. 623. Compare *Giroud v. Stryker, etc., Co.,* 104 N. J. L. 424, 140 Alt. 305.

''It is conceded that Bertiger was an employee of appellant and on appellant's business at the time of the accident. The argument for nonliability of the employer must necessarily rest on the theory that while the employee was driving his own car the employer could not have control over the manner of the employee's driving. If that were to be the test, an employer could never be held except in cases of willful wrong in giving instructions to an employee who later executes such wrongful instructions faithfully.''

In *Pinnix v. Griffin,* 219 N. C. 35, 12 S. E. (2d) 667, this language was used at p. 669:

''May the negligence of a servant in the use of his own car in the master's business render the latter liable for an injury when such use is habitual and known to the master, or could, by reasonable diligence, have

been known to the master? From the wide field of encyclopaedic law many decisions may be cited pro and con on this subject, and some of the opinions cited in the briefs in the instant case maintain the positions taken by the respective courts with commendable vigor. But it is no longer an open question in this State. For well-considered reasons, no doubt, this court has adopted the view that the employer is liable where the employee causes an injury by the negligent operation of his own car, used in the prosecution of the employer's business, when the latter knew, or should have known, that he was so using it.''

(Other cases which either expressly or impliedly support the majority view as heretofore set forth on the question under consideration may be found under "Annotation" in 60 A. L. R. 1163, 87 A. L. R. 787, 112 A. L. R. 920 and 140 A. L. R. 1150.)

Defendant relies upon and cites the following cases in support of its position: *Reardon v. Coleman Bros.,* 277 Mass. 319, 178 N. E. 638; *Holdsworth v. Pennsylvania Power & Light Co.,* 337 Pa. 235, 10 A. (2d) 412; *Gittelman v. Hoover Co.,* 337 Pa. 242, 10 A. (2d) 411; *Burster v. National Refining Co.,* 274 Ill. App. 104; *American Savings Life Ins. Co. v. Riplinger,* 249 Ky. 8, 60 S. W. (2d) 115; *McCarthy v. Souther,* 83 N. H. 29, 137 Atl. 445; *Wesolowski v. John Hancock Mut. Life Ins. Co.,* 308 Pa. 117, 162 Atl. 166.

All these authorities in which the facts are at all similar to the facts here hold directly or in effect that regardless of whether the servant, while driving his own automobile, was acting in furtherance of his master's business and within the scope or course of his employment and with the authority of his master, express or implied, and even though the employer pays all or part of the expenses of the operation of his employee's car, still no liability may be imposed upon the

master for the servant's negligent operation of his automobile unless it further appears that the master had control of or the right to control his employee in the actual management of his car. We are not in accord with the minority view as expressed in the cases cited by defendant that the essential test as to the master's liability for his servant's negligence in driving his own car within the course of his employment and even with the authority of his master, is the right of such employer to control the actual management and operation of the servant's car. We agree with the statement in *Kohl v. Albert Lifson & Sons, supra,* that "if that were to be the test, an employer could never be held except in cases of willful wrong in giving instructions to an employee who later executes such wrongful instructions faithfully."

We fail to see what difference it makes in so far as the employer's liability for the negligent act of his employee is concerned, whether the servant was driving his employer's car with his express authority or whether he was driving his own car with the implied authority of his employer, so long as in either case such driving was done in connection with his master's business and within the course of his employment or incidental thereto. It is difficult to perceive how defendant's liability for its servant's negligence would be affected by the fact that the car was owned by the servant and that he was paying the expenses of its operation.

In our opinion the controlling element in this case is whether Jones, acting within the course of his employment, was authorized to use his own automobile to get to his loading station and that presented a question of fact for the jury. The evidence discloses beyond a doubt not only that Jones was driving his car when the accident occurred with the acquiescence, knowledge, consent and permission of defendant but

that the city through O'Malley, its ward superintendent, actually encouraged him to do so. This being so the only permissible conclusion for the jury to have reached under the circumstances in evidence was that Jones had implied authority to drive his automobile to his loading station and that, since he had implied authority to so drive his car, his driving of same was within the course of his employment.

We are impelled to hold that the trial court did not err in denying defendant's motions for a directed verdict and for judgment notwithstanding the verdict.

The judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

FRIEND and SCANLAN, JJ., concur.