James Sloma, Plaintiff-Appellee, v. Burton E. Pfluger, Viola Carpenter, Administratrix of the Estate of Richard Lee Carpenter, Deceased, Viola Carpenter, Defendants, and L. H. Wood, Individually and d/b/a L. H. Wood Construction Company, Defendant-Appellant.

Gen. No. 69–130.

Second District.

June 18, 1970.

Rehearing denied September 3, 1970.

350

Joseph B. Lederleitner, Pretzel, Stouffer, Nolan & Rooney, of Chicago, for appellants.

Leonard M. Ring, Peterson, Bogucki & Beck, and John H. Bickley, Jr., of Chicago, for appellee.

MR. PRESIDING JUSTICE DAVIS delivered the opinion of the court.

The plaintiff, James Sloma, brought this suit against the Administratrix of the Estate of Richard Lee Carpenter, to recover damages for personal injuries which the plaintiff suffered on March 29, 1966, while riding in a pickup truck owned and operated by Richard Lee Carpenter. The plaintiff also sought recovery against L. H. Wood, individually and doing business as L. H. Wood Construction Company, the employer of both Carpenter and the plaintiff; and against Burton E. Pfluger, the driver of the other vehicle involved in the accident. Carpenter died as the result of the accident in question.

The trial court severed the issues of liability and damages and ordered that each issue be tried by a separate jury. The first jury found the defendants, Carpenter and Wood, liable, and the defendant, Pfluger, not liable. At a subsequent trial, the jury assessed damages in favor of the plaintiff in the sum of $380,000. At the trial on the issue of liability, the jury answered special interrogatories and found: that Carpenter was guilty of wilful and wanton conduct resulting in the accident; that the plaintiff was free from contributory wilful and wanton misconduct; that Carpenter was within the scope of his employment at the exact time of the accident (approximately 6:45 p. m.) ; that Carpenter was within the scope of his employment at an earlier

time, when he had arrived at a tavern at approximately 3:45 p. m.; and that Carpenter was within the scope of his employment at an earlier time, when he left the tavern in question at approximately 6:30 p. m. A judgment was entered on the jury verdicts, and the employer, Wood, appealed.

Wood contends that there was no probative evidence of the resumption of employment by Carpenter after approximately two and one-half hours of drinking in the tavern, and that he, thus, was entitled to a directed verdict; that the verdict and answers to the interrogatories are against the manifest weight of the evidence; that certain opinion evidence as to the cost of future custodial care for the plaintiff was erroneously admitted, in that there was no evidence of the necessity for such custodial care; and finally, that the verdict of $380,000 is excessive and the result of errors committed in the course of the trial.

Wood was engaged in the business of erecting dry walls as a part of the construction of new buildings. He employed between one hundred fifty and two hundred men, and had four superintendents working for him. His operations encompassed the Chicago metropolitan area, north to Waukegan and west to Rockford. His main office was in Algonquin. The materials that were needed for the jobsites were either delivered to these sites, or kept in supply trailers throughout the area. Wood's superintendents had keys and access to these supply trailers. The materials stored in the trailers were normally delivered to the various jobsites by superintendents, or by employees hired for that purpose.

Carpenter was employed by Wood as a taper. He was a capable worker and his work ranged over a wide area. He required less supervision than many, or most, of Wood's employees. Apparently, Mr. Darnell, his superintendent, merely told him where his job assignments were to be. Carpenter's work relationship was rather

unique in that he had his own pickup truck, which he drove to his various jobsites, and in which he carried his supplies and tools. He lived in Carpentersville, and his employer maintained a supply trailer in Meadowdale—a shopping center about a mile and a half from Carpenter's home. This trailer was primarily for Carpenter's use, and even though he was not a superintendent, he had a key to this supply trailer. Carpenter's key opened only this supply trailer—not the other trailers belonging to Wood. Carpenter was not paid an hourly rate; but rather, was paid on a piecework basis.

The plaintiff was eighteen years old at the time of the accident. He had been employed by Wood for a little over a year, and had been working directly with Carpenter for approximately two months. Carpenter's superintendent, Darnell, testified that he had "given" the plaintiff to Carpenter to use as a laborer-apprentice. The plaintiff was paid an hourly rate and was paid only from the time he arrived at the job until the time he left, and was not paid for any transportation time. He lived about a half a block from Carpenter in Carpentersville, and rode daily to and from the various jobsites with Carpenter, in the latter's pickup truck.

On the day in question, the plaintiff and Carpenter had worked on a job in Belvidere, which they completed. They left the jobsite at about 3:30 p. m., and drove to a tavern in Belvidere where they frequently stopped while working in the Rockford or Belvidere area. On this occasion, they remained in the tavern for about two and one-half hours. During this time, Carpenter had five or six bottles of beer, but the plaintiff had nothing alcoholic to drink. The plaintiff testified that Carpenter's eyes were glassy when they left the tavern at about 6:30 p. m., but that his speech and gait were normal, and that he did not believe Carpenter to be intoxicated. They got into the pickup truck—Carpenter driving—and proceeded east on U. S. Highway 20. The

plaintiff testified that he placed his knees on the dashboard and fell asleep almost immediately.

The accident took place about a mile east of Belvidere, on U. S. Highway 20—a paved two-lane highway at this point. Pfluger was driving a large tractor-trailer truck combination in an easterly direction at the time and place in question, and at the time of the accident was making a left-hand turn into a restaurant driveway, and was, thus, partially in the westbound lane of traffic. Carpenter's pickup truck struck the rear of Pfluger's vehicle. Witnesses estimated that Carpenter's pickup truck was travelling at a speed of from 70 to 90 miles per hour. The pickup truck exploded and burned: Carpenter was killed and the plaintiff severely injured. Visibility was good at this time and place.

The plaintiff testified that when they left the tavern they were then going to Meadowdale to pick up supplies; that they would go to Meadowdale for supplies before Carpenter would take him home because he lived only a half block from Carpenter; and that they intended to pick up supplies that night since they had completed the job in Belvidere and had only four or five bags of supplies left in the pickup truck, and it would take fifteen or twenty bags for the next day's work. It is undisputed that the plaintiff was not paid for any help he might give Carpenter in loading the supplies.

He further testified that, depending upon where they were to be working the following day, they would, at times, pick up supplies at night, to save time the following day; that they normally started work at about 7:00 a. m., and that the plaintiff knew that they were going to be working at either the Whitehall or Woodview jobsites in Prospect Heights the following day. Darnell, the superintendent, testified that he had planned to call Carpenter that evening to advise him that they would be working at Woodview the following morning.

The plaintiff also testified that Carpenter had told him that they were going to Meadowdale to pick up supplies. This testimony was stricken by the court and the jury was advised to disregard it.

We will first consider Wood's contention that he was entitled to a directed verdict on the issue of liability. Wood contends that if, at the time of the accident, the plaintiff and Carpenter were going to pick up supplies, then the plaintiff, too, was in the scope and course of his employment; and that in such event, Wood, the employer, is not liable for the injuries caused by the co-employee, Carpenter.

■ While Carpenter was on piecework and paid accordingly, the plaintiff was paid by the hour, and only for the time on the jobsite. His duties did not include picking up the supplies for the work to be done. Apparently, Carpenter was the only employee who was authorized and actually expected to pick up his supplies. If the plaintiff aided Carpenter, he did so as a volunteer. The evidence does not support any agreement or understanding between Wood and the plaintiff which could be held to create an obligation on the plaintiff, as part of his employment, to assist Carpenter in the loading of supplies.

The plaintiff obviously had a convenient source of transportation to and from his place of work. Because he lived near Carpenter, it was also convenient to stop for the supplies before dropping the plaintiff off at his home. But, this was a matter between Carpenter and the plaintiff. As for Wood, the employer, it mattered not whether the plaintiff rode with Carpenter, with someone else, or by himself; or if he rode with Carpenter, whether the latter took him home before or after getting the supplies. Apparently, the plaintiff had no concern as to the time when he arrived home, as

355

was evidenced by the customary stop at the tavern on the route home.

■ The determination of when one ceases to be an employee is often difficult. However, the facts in this case suggest that the plaintiff's scope of employment began and ended at the jobsite; that there was nothing to take him out of the normal rule that travel to and from the place of employment is beyond the realm of the employment relationship; and that one injured in the course of such travel is not injured as an employee. Urban v. Industrial Commission, 34 Ill2d 159, 161, 214 NE2d 737 (1966); Christian v. Chicago & I. M. Ry. Co., 412 Ill 171, 175, 105 NE2d 741 (1952).

■ The trial court left the question of whether the plaintiff occupied the status of a guest of Carpenter or an employee, while riding with Carpenter, for the jury to decide. This was proper under the facts of this case. See: Leonard v. Stone, 381 Ill 343, 345, 45 NE2d 620 (1943).

■ The plaintiff, however, had no cause of action against Wood unless Carpenter was still acting within the scope of his employment at the time of the accident. This, it appears from the record, is even a closer question. It is admitted that Carpenter was on a lark of his own for in excess of two and one-half hours while at the tavern. It is equally true, however, that such a deviation from his duties will not, as a matter of law, prevent him from returning to the course of his employment. In Parotto v. Standard Paving Co., 345 Ill App 486, 490, 104 NE2d 102 (1952), it was held that a deviation in time of approximately seven hours and, in distance, of some four miles, was not as a matter of law so substantial as to relieve the employer of liability for the employee's tortious acts. In Kavale v. Morton Salt Co., 329 Ill 445, 160 NE 752 (1928), the court refused to set aside a jury verdict against the

employer where the employee's deviation had existed for approximately three hours.

■ The mere fact that Carpenter was driving his own truck and not one belonging to Wood, is not decisively significant. Unlike most employees, Carpenter brought the supplies needed for a particular day's work to the jobsite, and Wood provided a supply trailer, near Carpenter's home, for his use. Carpenter had a pickup truck so that he could carry these supplies. Ignoring for a moment the personal lark of Carpenter and the question of the effect of the deviation from the course of his employment, inasmuch as he was intending to get his supplies for the next day, he was driving his pickup truck with the implied authority of Wood.

■ The lack of immediate supervision over Carpenter in picking up his supplies, appeared no less than that exercised over him at the jobsite. Wood knew that Carpenter picked up his own supplies and provided a special trailer for this purpose. Thus, Carpenter's use of his own vehicle for his employer's business was not only with the latter's knowledge and consent, but also with his encouragement. When so driven, it was within the course of Carpenter's employment. Hogan v. City of Chicago, 319 Ill App 531, 539, 543–546, 49 NE2d 861 (1943).

■ Wood insists, however, that there is no evidence that he authorized Carpenter to invite anyone to ride as a "guest" with him. We believe, however, that when an employee is using his own vehicle for his employer's purpose, the same rule prevails with reference to a guest in the vehicle as when the vehicle is employer-owned. The employer may not be held liable under the doctrine of respondeat superior where the employee has taken a guest in the vehicle, contrary to the express instructions of the employer, even though the employee is acting within the scope of his employment. Klatt v. Com-

monwealth Edison Co., 33 Ill2d 481, 495, 498, 211 NE2d 720 (1965). Here, however, Wood did not prohibit Carpenter from transporting the plaintiff. In fact, the evidence suggests that Wood, through the superintendent, Darnell, not only knew of the transportation arrangement, but also encouraged it. Wood had the right to advise Carpenter not to permit any guests to ride with him when he obtained supplies for his work, but this prerogative was not exercised. Under these circumstances, Wood may be held liable under the doctrine of respondeat superior.

The critical question is whether or not there was probative evidence that Carpenter had returned from the deviation from the course of his employment and was going to pick up supplies and, thus, was again in the course of his employment. We believe the evidence set forth above relative to Carpenter having a supply trailer for his use, the location of the trailer, the fact that he picked up supplies in the evening as well as in the daytime, the hour he was to start work the next day, the location of the two places where he might work the following day, the number of bags of supplies in the truck, and the number needed for work the following day, constituted sufficient facts for the case to go to the jury. All of the evidence, viewed in the light most favorable to the plaintiff, is not such that the verdict for him cannot stand. Pedrick v. Peoria & E. R. Co., 37 Ill2d 494, 510, 229 NE2d 504 (1967).

The evidence in this case, particularly on the issue of whether or not Carpenter was acting within the scope of his employment, is somewhat meager. This is to be expected in this type of case—where death has sealed the lips of the one who might otherwise have shed the most light on the question. The plaintiff was compelled to tell his story with the best evidence available to him. The jury believed that under the law as given to them by the court the plaintiff was entitled to

a verdict. The trial judge, who had an opportunity to hear the testimony and observe the witnesses, denied the defendant a new trial and upheld the verdict of the jury. Mindful of all of this, we are of the opinion that we may not substitute our judgment for that of the jury; the verdict is not palpably erroneous or wholly unwarranted from the manifest weight of the evidence. Johnson v. Central Tile & Terrazzo Co., 59 Ill App2d 262, 273, 274, 207 NE2d 160 (1965).

The defendant suggests that our decision in Sauer v. Iskowich, 80 Ill App2d 202, 224 NE2d 21 (1967) is indicative that Carpenter had terminated his employment on the day in question, prior to the time of the accident, and could not be found to have returned thereto. But, in Sauer, the employee was not a continuing employee, but one hired only to pick up and return a repossessed car. He did so, leaving it at one of the designated places. When he did that we indicated his job was completed: he no longer was employed. When he returned later and picked up the car, it was entirely for his own frolic and had no connection with the employer's business. We indicated in Sauer, at pages 206 and 207, the types of factors to be considered in deciding whether one is within the scope of his employment. It should be apparent from these, that it is the exceptional case where this determination can be made as a matter of law.

While discussing this aspect of the case, we might make reference in passing to testimony stricken by the court. Wood suggests that this was the only evidence of probative value, and that if the jury disregarded it, there was nothing left on which to base their verdict. Our opinion, of course, is the contrary; and, likewise, we believe that the stricken evidence should have been admitted.

██ ██ Whether or not Carpenter had returned to his course of employment at the time of the accident

depended, to a large extent, on his intent at the time. Did he intend to stop to pick up supplies? If he did, then this intent itself was a factor for the jury's consideration in deciding whether he was again in the course of his employment. The plaintiff testified that Carpenter expressed this intent by saying he was going to pick up the supplies. Whenever intention is itself a distinct and material fact in a chain of circumstances, as it was here, it may be proved by testimony of contemporaneous oral declarations. Quick v. Michigan Millers Mut. Ins. Co., 112 Ill App2d 314, 320, 250 NE2d 819 (1969). Thus, where the statement is offered to show only the state of mind of a person at a given time it should be admitted, with appropriate instructions. The testimony of Carpenter's statement to the plaintiff should have been admitted insofar as Wood was concerned.

■■ In this case, the question of whether the plaintiff—in accepting the ride with Carpenter after the drinking bout and in falling asleep immediately upon getting into the pickup truck—was guilty of wilful and wanton conduct, was clearly a question of fact for the jury's determination. See: Hamas v. Payne, 107 Ill App 2d 316, 323, 246 NE2d 1 (1969); Dursch v. Fair, 61 Ill App2d 273, 285, 209 NE2d 509 (1965); Anderson v. Launer, 13 Ill App2d 530, 537, 142 NE2d 838 (1957).

■■ ■■ The evidence disclosed that the plaintiff was a considerable distance from his home; that on prior occasions, Carpenter and the plaintiff had stopped at the tavern for Carpenter to have a beer without any apparent problems; that when leaving the tavern, Carpenter's eyes appeared glassy to the plaintiff, but his speech and gait were normal; and that the plaintiff did not think Carpenter was intoxicated. As the above-cited cases indicate, when one person who has accompanied another drinking, then rides with him and

even falls asleep leaving the driver alone with his task, it will normally be within the province of the jury under the particular facts of each case, to determine whether the guest was guilty of wilful and wanton conduct in so doing. The jury's determination in this regard was not contrary to the manifest weight of the evidence.

The plaintiff's judgment was in the sum of $380,000. The essential testimony indicated that he had a 100% impairment of the function of his right arm, 50% impairment of the function of his left arm and a 10% impairment of both legs. The plaintiff's mother testified that she cares for him in that he is unable to do a number of ordinary tasks for himself. He suffered second and third degree burns over more than 70% of his body, including his face. He suffered contractures of the hands, wrists, arms and face, a broken nose and ribs. His right hand was paralyzed, and both hands are in a wristdrop position.

At the date of the trial, the plaintiff had spent sixteen months in hospitals, during five separate confinements, had undergone approximately twenty-six operations and could expect eleven more. The medical expenses to date totalled close to $36,000, and future medical expenses would be approximately $10,600. The plaintiff was eighteen years of age at the time of his injury. His loss of earnings—present and future expected— as testified to by an economist, totalled $318,600. The economist also testified that the cost of custodial care, assuming that the plaintiff's parents could care for him during the balance of their life expectancies, would total $42,900. It would thus appear that the total damages awarded by the jury was not excessive, even if the said sum of $42,900—the alleged cost of such custodial care— were excluded.

■■■ If the elements of damage presented for the jury's consideration are proper under the facts of the

case, then the assessment of damages is preeminently for the jury. Lau v. West Towns Bus Co., 16 Ill2d 442, 452, 158 NE2d 63 (1959). No two cases will be identical in reference to the nature of the injuries suffered, but other awards have been upheld as not excessive which are somewhat in line with that made by the jury in this case. See: Kaspar v. Clinton-Jackson Corp., 118 Ill App2d 364, 254 NE2d 826 (1969); Hulke v. International Mfg. Co., 14 Ill App2d 5, 142 NE2d 717 (1967).

██ ██ Clearly, the plaintiff was entitled to substantial damages. Reasonable men could be expected to differ as to the amount. Considering all of the factors, the amount of the damages was not so clearly excessive as to require us to disturb the jury's verdict on this ground. Murphy v. Lindahl, 24 Ill App2d 461, 472, 165 NE2d 340 (1960).

██ The defendant argues, however, that the testimony of the economist as to the estimated cost of $50 per week for a daytime maid from the date of the death of the plaintiff's mother—based upon her life expectancy—to the date of the death of the plaintiff—based upon his life expectancy—which would total $42,900, was too speculative. Wood argues that there was no adequate evidence that the plaintiff would require such custodial care.

The economist testified as an expert, and gave his estimated cost of custodial care based on the assumption that the plaintiff would need such care. We do not believe that there was sufficient evidence in this record to support the hypothesis that the plaintiff would need such care for the rest of his life. The doctor who testified to the loss of function, particularly in the right arm, stated: "Now, whether that means custodial care to you, I don't know." The evidence disclosed that

the plaintiff could be left alone, and without assistance could take care of his personal hygiene, could move about, make a sandwich, and even drive a car. We believe, under these circumstances, that there was an absence of basic and essential facts necessary to support an award for such custodial care, and that the testimony as to the cost of future custodial care was too speculative and conjectural to have any probative value. Abramson v. Levinson, 112 Ill App2d 42, 47, 250 NE2d 796 (1969); Marshall v. First American Nat. Bank of Nashville, 91 Ill App2d 47, 53, 233 NE2d 430 (1968).

It is impossible for us to tell the extent to which the $42,900 figure for custodial care entered into the final determination of the jury. Obviously, however, this testimony could not have increased the total amount of the verdict more than $42,900.

Under these circumstances, the judgment of the Circuit Court will be affirmed upon the filing by the plaintiff, within thirty days from the finality of this judgment, of his consent to a remittitur of $42,900; otherwise, the judgment is reversed and the cause is remanded for a new trial on the issue of damages only.

Judgment affirmed upon filing of a consent to remittitur within thirty days: otherwise, judgment is reversed and cause is remanded.

ABRAHAMSON and MORAN, JJ., concur.