JUANA LINDSEY, Successor Adm'r of the Estate of Beverly Powell, a/k/a Beverly Robinson, Deceased, Plaintiff-Appellant, *v.* SCHICK, INC., Defendant-Appellee.

First District (2nd Division)    No. 83—1010

Opinion filed June 19, 1984.—Rehearing denied July 20, 1984.

Sidney S. Altman, of Chicago, for appellant.

Schaffenegger, Watson & Peterson, Ltd., of Chicago (Donald G. Peterson, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Juana Lindsey, successor administrator of the estate of Beverly Powell, deceased, sued defendant Schick, Inc., in a product liability suit for the wrongful death of Beverly Powell, who was electrocuted while using a Schick Facial Sauna in a bathtub. A jury found for defendant. Plaintiff appeals from the judgment entered on the verdict.

Plaintiff contends the sauna was faulty because of the lack of a ground wire and the instructions given the jury were inadequate because the trial court refused plaintiff's instruction on foreseeability.

On September 12, 1975, deceased, who was born in Panama in 1948, was found in the water-filled bathtub in her apartment. In her mouth she had an extension cord from an electrical outlet to which was connected the electrical cord from a facial sauna on a stand next to the bathtub. The electrical cord was in her right hand. There was approximately a one-eighth to a one-quarter inch gap in the connection between the extension cord and the appliance. When she was found, the cord in her mouth was still sparking. The female end of the extension cord, which received the two prongs of the appliance cord, and the male end of the appliance cord with its two prongs were charred. The appliance was not charred. There was charred blackness around her mouth. The burns coincided with the charring on the plugs. It appeared that deceased had been trying to plug the appliance into the extension cord while holding it in her teeth and that moisture in one or both parts of the plugs had caused the electrical current to run through her body and through the water.

Gusto Alamar, a rewirer of electric motors for the Chicago Transit Authority, testified for plaintiff. He had two years of electrical engineering study at the Chicago Technical College and two years at De Vry Technical Institute specializing in electronic courses. He did not have a degree in electrical engineering. On May 25, 1982, he checked the electrical outlets in deceased's building and determined that they were grounded. The voltage was correct and there was no cross-wiring. He testified as to the principle of a third (ground) wire on an extension cord: one prong of the extension wire plug carries the electrical current; one prong carries the return current and the third prong (round in shape) is the grounded prong. It is connected through the internal wiring to the electrical box and directly to the earth. It is a safety device; it provides a path of lowest resistance and grounds the current to the earth and trips the circuit breaker or fuse.

He further testified that saliva between two connected plugs would be dangerous to an individual who held the connection with the

teeth. In a bathtub of water such an incident would result in a shock which could be fatal. He said that a cord with a third prong might either avoid the shock or reduce the severity of the shock. It was his opinion that in a hypothetical situation similar to the facts in this case and assuming the use of three wire grounded cord, the result would not be fatal, because the majority of the current would transfer through the third prong and blow the circuit breaker and fuse. However, the presence of a grounding wire would not eliminate the hazard of a shock to an individual who is placed in the circuit. A person in contact with the hot wire and the ground wire of a three-prong plug would get a shock. If a person were in contact with all three prongs, not all the electricity would pass through the body. A human body in a tub of water would act as a conductor of electricity. Although he did not specifically know what amount of amperage would kill a person, he would agree that one ampere would do it.

Plaintiff read into the record the evidence deposition of Harris Kamide, an electrical engineer with 30 years' experience and an instructor at the Illinois Institute of Technology and Harvard. He had examined the facial sauna and found no indication of electrical current leakage from the heating element and there were "no cords connected to the rolls supply voltage." The conduction of the current to the outside source, such as an individual or a path to ground, was inevitable. It is standard practice for companies to include a ground wire or third wire in products such as this. It is also customary for such products to have a warning label if there are any dangers in connection with the use of the product. Assuming the facts of this case and that a ground wire was used in the facial sauna cord, it was his opinion that the grounding plug third wire would have prevented electrocution. The ground plug would have diverted electrical current away from the body.

Plaintiff introduced into evidence a transcript of the coroner's report pursuant to the Evidence Act (Ill. Rev. Stat. 1981, ch. 51, pars. 3.01 through 3.03) for the purposes of showing a *prima facie* cause of death.

William Hess, senior vice-president of operations of defendant Schick, was called by plaintiff as an adverse witness. He identified the facial sauna as defendant's product. He did not know the difference in cost between a two-prong plug and a three-prong plug. He did not think that the required use of an adapter, if the product had a three-prong plug, would put a damper on sales.

William Hess, testifying for defendant, stated that an exhibit which he identified as an instruction booklet for the sauna was, in the

regular course of business, packaged with each sauna. In the booklet under the caption "Important Safeguards," it is stated "Do not use while bathing or in a location where it may fall into water or liquids."

Robert Kmourek, a retired electrical engineer, also testified for the defense. He had worked for Underwriter's Laboratories, Inc. (UL), since 1946. Part of his duties was to test and examine electrical appliances for safety. The facial sauna manufactured by Schick was certified by UL. Its cord contained two wires. He was familiar with the certification process of an appliance: Tests were conducted to determine that a product is constructed so that it is safe. Further, four unannounced checks of the factory assembly line are made by an UL representative during the year.

Assuming the hypothetical facts of this case, he stated that the absence of a third wire in the appliance cord did not render the product unreasonably dangerous and that the presence of a third, ground wire would not have helped prevent a shock or death. It would not matter whether the facial sauna was turned on or off.

He testified that two-tenths of an ampere for one second would kill a human being. The ordinary circuits in residential areas are 15 amperes and 20 amperes for the kitchen.

Referring again to the hypothetical facts, he stated that the use of a ground wire would not have activated a circuit breaker or fuse. A ground wire has a higher resistance than both a hot or neutral wire. He further testified that there is a ground wire connected to the plastic case of the facial sauna. This is to protect against the hazard of electrical shock from the metal part of the product's case. This third wire would not have anything to do with the hazard of an individual coming in contact with the appliance's plug.

The National Electric Code establishes rules for buildings and electrical construction. It advises inspectors to require appliances to be tested for safety. This code lists appliances that should be grounded. It does not include the facial sauna on this list. UL standards also do not mandate a third wire for appliances such as the facial sauna.

He further testified on cross-examination that his responsibilities at UL covered commercial cooking appliances which did not include the facial sauna. He read the definition of grounding in an article by Robert Sealback, a chief engineer at UL: grounding "provides electric current with easy access to the ground in case of short circuiting ***." He did not understand the meaning of an expression "easy access to the ground."

He also testified that the sauna itself utilizes the element of mois-

ture in its recommended use. There is no warning on it that, in order to prevent shock hazard, the appliance should not be exposed to rain or moisture.

Kmourek was asked to assume that a woman just out of a swimming pool was plugging an electric barbecue cord into an extension cord each of which had three wires; that there was a one-eighth inch gap and water dripped onto the gap from her hand or hair. So assuming, he testified there was a good chance that a short would occur, and that it is possible that the woman would receive a shock if her hand was lightly resting on the plugs in contact with the water which caused the short.

Plaintiff argues that the evidence shows that the facial sauna was faulty because of the lack of a ground, or third, wire in the electrical cord. After summarizing the facts set out above, plaintiff concludes that issues of fact were supported by the greater weight of evidence in her favor.

■ It is settled law, however, that a jury's verdict should not be set aside unless it is palpably erroneous or wholly unwarranted by the manifest weight of evidence. (*Sloma v. Pfluger* (1970), 125 Ill. App. 2d 347, 261 N.E.2d 323.) Here, there was sufficient evidence in the record from which the jury could have concluded that the use of a ground wire in the appliance cord would not have prevented the accidental electrocution of deceased. The jury could also have concluded that the warning contained in the instruction booklet was sufficient to warn against the use of the sauna near a full bathtub. The jury's verdict cannot be said to be manifestly erroneous.

■ Plaintiff also argues that, if the jury had been properly instructed, the verdict would have been in her favor. She contends that the trial court committed reversible error in refusing the following instruction tendered by her:

> "You are further instructed that if the use of a product is abnormal, but nonetheless one that may be anticipated, it may be foreseeable. There is a distinction between the intended use and the foreseeable use, and where a particular use should be known to the reasonably prudent manufacturer such use cannot be labeled unforeseeable."

Plaintiff adopts this language from *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859, arguing that this instruction (although not an IPI instruction) is proper because liability includes any foreseeable danger that is incident to the possession of the product.

In *Kerns*, the court said:

> "If the use of a product 'is abnormal, but nonetheless one that

may be anticipated, it may be foreseeable.' (2 Dooley 360.) There 'is a distinction between the intended use and the foreseeable use, and *** where a particular use should be known to the reasonably prudent manufacturer such use cannot be labelled unforeseeable.' " 76 Ill. 2d 154, 165.

We hold as a matter of law that it cannot be said that a reasonably prudent manufacturer should know that a user (while in a bathtub filled with water) would attempt to use its facial sauna by holding the female end of an extension cord in her mouth while attempting to insert the male end of the sauna's cord into the extension cord. Such use by decedent was not one that may be anticipated and thus one that was reasonably foreseeable. The instruction was properly refused.

Further, the record shows that the jury was properly instructed as to plaintiff's theory of the case. Instructions were given based on her claim that (a) the sauna was unreasonably dangerous when it left defendant's control because of the absence of (1) a grounded electrical cord and plug and of (2) a label warning that exposure of the cord and plug to moisture or water could result in electrocution and that (b) she had the burden of proof that those conditions were the proximate cause of decedent's death. (Illinois Pattern Jury Instructions (IPI), Civil, Nos., 400.01, 400.02 (2d ed. 1971).) The jury was also correctly instructed as to the meanings of "proximate cause" (IPI Civil No. 400.04) and "unreasonably dangerous" (IPI Civil No. 400.06). Plaintiff was not prejudiced by the refusal to give her tendered instruction.

■ In plaintiff's brief, she lists as one of the issues presented for review the contention that she was prejudiced by defense counsel's improper questioning which inferred that deceased had been intoxicated. This contention is not properly before the court. It is mentioned neither in her points and authorities nor in her argument. It is therefore waived. 87 Ill. 2d Rule 341(e)(1), (7).

Even if not waived, it is without merit. Each time defense counsel asked questions relating to the possibility of deceased's intoxication he was quickly cut off by the trial court. It was not discussed in closing argument. There is nothing in the record to indicate any prejudicial effect on the jury. There is no basis for overturning the jury's verdict. See *Tate v. Coonce* (1981), 97 Ill. App. 3d 145, 421 N.E.2d 1385.

The judgment of the circuit court of Cook County is affirmed.

HARTMAN, P.J., and STAMOS, J., concur.