Anthony **LUTH** and Jeannette Luth,
Appellants,

v.

**ROGERS AND BABLER CONSTRUCTION
COMPANY, Appellee.**

**ROGERS AND BABLER CONSTRUCTION
COMPANY, Appellant,**

v.

Anthony **LUTH** and Jeannette Luth,
Appellees.

**Nos. 1621, 1623.**

Supreme Court of Alaska.

March 19, 1973.

762

William M. Erwin, Anchorage, for appellants Anthony annd Jeannette Luth in No. 1621, and appellees in No. 1623.

Charles P. Flynn, Burr, Pease & Kurtz, Inc., Anchorage, for appellee Rogers and Babler Constr. Co. in No. 1621, and appellant in No. 1623.

Before RABINOWITZ, C. J., CONNOR and BOOCHEVER, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Anthony and Jeannette Luth were driving south on the Seward Highway when their car collided with another driven by Wayne Jack and owned by John and Freida Knox. The accident occurred approximately two miles north of Twenty Mile Creek when Jack attempted to pass another vehicle going north. On the day of the accident, and for the previous six weeks, Wayne Jack was employed by Rogers and Babler Construction Company as a flagman on a road construction project. At the time of the accident, he was returning home to Anchorage from his jobsite at Twenty Mile Creek, having completed a 7 a. m. to 5:30 p. m. workday. Since he did not live near the jobsite, Jack commuted approximately 25 miles to work by car everyday. The Master Union Agreement under which Jack worked provided for payment of $8.50 daily additional remuneration, since the jobsite was located a considerable distance from Anchorage. However, all of Rogers' employees on this particular construction project received the $8.50 additional remuneration whether they commuted from Anchorage or lived near the jobsite.

At trial, Rogers moved for a directed verdict, arguing that it could not be liable on the basis of *respondeat superior*, since Jack was not acting within the scope of his employment at the time of the accident. In regard to this motion, Rogers conceded that Jack's negligent driving caused the collision with the Luths' vehicle. The trial court denied Rogers' motion and in turn granted Luths' motion for directed verdict, ruling as a matter of law that Rogers was liable under the *respondeat superior* doctrine.

After the jury returned verdicts of $4,500 and $2,500 for Anthony and Jeannette Luth respectively, Rogers moved for a $3,500 reduction. Rogers based its motion on the fact that the Luths had received $3,500 from John and Freida Knox, owners of the vehicle driven by Wayne Jack at the time of the accident.

■ Under the doctrine of *respondeat superior*, an employer is liable for negligent acts or omissions of his employee committed in the scope of his employment. However,

Rogers attempts to avoid liability for Jack's negligence by relying on the so-called "going and coming" rule. Under this rule, an employee is ordinarily considered outside the scope of his employment while going to and from work.[1] Some courts justify this rule by reasoning that ordinarily the employment relationship is suspended and thus the employer has no right to control the employee from the time the employee leaves his work until he returns.[2] Others reason that while commuting the employee is not rendering service growing out of, or incidental to, his employment.[3]

The Luths attempt to circumvent the going-and-coming rule by urging this court to obliterate the distinction between the tort concept "in the scope of employment" and the workmen's compensation concept "arising out of and in the course of employment." As part of their argument, the Luths emphasize that workmen's compensation law recognizes an exception to the going-and-coming rule for employees who receive travel allowances for commuting to and from remote jobsites and who are injured while so commuting.[4]

Until recently, this court maintained that *respondeat superior* issues would be resolved by applying the "right to control" test and other factors delineated in the Second Restatement of Agency.[5] Then, in Fruit v. Schreiner,[6] we adopted a modified "enterprise theory" of *respondeat superior*, without rejecting Restatement criteria. In *Fruit*, we noted the similarity between Alaska workmen's compensation policy and the enterprise theory of vicarious tort liability. But we did not equate the tort concept "in the scope of employment" with the workmen's compensation concept "arising out of and in the course of employment." Nor have other decisions of this court used these concepts interchangeably.[7] Moreover, we do not discern a trend in other jurisdictions to equate these two concepts.[8]

1. *See, e. g.*, Lundberg v. State, 25 N.Y.2d 467, 306 N.Y.S.2d 947, 255 N.E.2d 177, 179 (1969) ; Larkins v. Utah Copper Co., 169 Or. 499, 127 P.2d 354, 358 (1942) ; Elder v. Cisco Constr. Co., 52 Wash.2d 241, 324 P.2d 1082, 1084 (1958).

 While we have not been called upon to apply the going-and-coming rule in a tort case, we have recognized the rule in previous decisions. *See* Fruit v. Schreiner, 502 P.2d 133, 139 (Alaska 1972) (tort) ; State, Dep't of Highways v. Johns, 422 P.2d 855, 857 (Alaska 1967) (workmen's compensation) ; RCA Serv. Co. v. Liggett, 394 P.2d 675, 677–678 (Alaska 1964) (workmen's compensation).

2. *E. g.*, Harvey v. D & L Constr. Co., 251 Cal.App.2d 48, 59 Cal.Rptr. 255, 257 (1967) ; Lundberg v. State, 25 N.Y.2d 467, 306 N.Y.S.2d 947, 255 N.E.2d 177, 179 (1969).

3. *E. g.*, Robinson v. George, 16 Cal.2d 238, 105 P.2d 914, 917 (1940).

4. *See* 1 Larson, Workmen's Compensation §§ 16.20, 16.30 (1965) ; *e. g.*, State, Dep't of Highways v. Johns, 422 P.2d 855, 860 (Alaska 1967).

5. *See, e. g.*, Laborers & Hod Carriers U., Loc. No. 341 v. Groothuis, 494 P.2d 808, 810 n. 6 (Alaska 1972) ; Reader v. Ghemm Co., Inc., 490 P.2d 1200, 1203 (Alaska 1971). *See* Restatement (Second) of Agency §§ 220, 228, 229 (1958).

6. 502 P.2d 133, 138–142 (Alaska 1972) ; Although not usually enunciated as a basis for liability, in essence the enterprise may be regarded as a unit for tort as opposed to contract liability purposes. Employees' acts sufficiently connected with the enterprise are in effect considered as deeds of the enterprise itself. Where through negligence such acts cause injury to others it is appropriate that the enterprise bear the loss incurred. *Id.* at 141.

7. *See, e. g.*, Laborers & Hod Carriers U., Loc. No. 341 v. Groothuis, 494 P.2d 808, 810 n. 6 (Alaska 1972) ; Searfus v. Northern Gas Co., 472 P.2d 966, 969 (Alaska 1970).

8. *See, e. g.*, Conversions & Surveys, Inc. v. Roach, 204 F.2d 499, 501 (1st Cir. 1953) ; Harris v. Hymel Store Co., 200 So.2d 84 (La.App.Ct.), *writ refused*, 251 La. 47, 202 So.2d 657 (1967) ; Lundberg v. State, 25 N.Y.2d 467, 306 N.Y.S.2d 947, 255 N.E.2d 177 (1969). Even the California cases on which the Luths rely have not completely assimilated workmen's compensation and *respondeat superior* concepts. *See* Huntsinger v. Fell, 22 Cal.App.3d 803, 99 Cal.Rptr. 666, 668–669 (1972).

While workmen's compensation law and *respondeat superior* doctrine both involve allocations of costs regarding industrial accidents, they differ in scope. Workmen's compensation benefits turn solely upon whether the employee was injured while performing an activity related to his job—and "relatedness" is usually a function of benefit to the employer. In contrast, *respondeat superior* subjects employers to liability for injuries suffered by an indefinite number of third persons. To limit this burden of liability, the narrower concept,[9] "scope of employment," has long been tied to the employer's right to control the employee's activity at the time of his tortious conduct. We do not consider the right to control as being a prerequisite to a holding of liability, but it is a factor that may be considered in determining whether the employee's activity is sufficiently related to his employer's enterprise. While the employer's benefit from the employee's activity is relevant to the existence of vicarious liability, benefit is not its sole determinant.[10] We therefore reject the Luths' argument that workmen's compensation law be applied in this tort case.

By rejecting the Luths' primary argument made in support of the trial court's directed verdict, however, we do not necessarily hold that Rogers cannot be vicariously liable for Jack's negligence. Fruit v.

Schreiner holds that resolution of scope of employment questions will "depend primarily on the findings of fact in each case"[11] and that the "factual determination generally is left to the jury."[12] For example, in determining the applicability of a particular exception to the going-and-coming rule, the Supreme Court of Washington stated:

The "exceptions" to the general rule, to which appellants refer, generally, if not invariably, spring from the particular facts and circumstances of the cases out of which they arise. And, in those instances where there is any valid evidentiary dispute, *conflict* or *interpretative* issue surrounding the employment status of an employee, while going to or coming from his day's work, the applicability of a recognized exception to the general rule becomes a question of fact to be resolved by the trier of the facts. It is only when the dispositive facts relative to the questioned employer-employee relationship are without dispute, *or are such as to lend themselves to but one conclusion,* that they compel a given determination.[13] (Emphasis added.)

Moreover, the Restatement recognizes that scope of employment questions are jury issues where conflicting inferences can be drawn from undisputed facts.[14]

9. *See* Saala v. McFarland, 63 Cal.2d 124, 45 Cal.Rptr. 144, 403 P.2d 400, 404 (1965).

10. *See* Gossett v. Simonson, 243 Or. 16, 411 P.2d 277, 279 (1966).

11. 502 P.2d at 141.

12. *Id.* at 140.

13. Balise v. Underwood, 71 Wash.2d 331, 428 P.2d 573, 577 (1967). *See also* Gossett v. Simonson, 243 Or. 16, 411 P.2d 277, 280 (1966), where the court stated that

the trial court should decide the issue of scope of employment as a matter of law only when no more than one reasonable inference could be drawn from the facts. If the facts are in dispute, the jury must determine what the facts are. When conflicting inferences reasonably can be drawn from undisputed facts, it

is also for the jury to decide whether the servant was working within or outside the scope of [his employment].
*See also* Burger Chef Systems, Inc. v. Govro, 407 F.2d 921, 925 (8th Cir. 1969); United States v. Romitti, 363 F.2d 662, 664 (9th Cir. 1966); Huntsinger v. Fell, 22 Cal.App.3d 803, 99 Cal.Rptr. 666, 670 (1972); Gibbs v. Miller, 283 N.E.2d 592, 594 (Ind.App.1972); Anzenberger v. Nickols, 413 Pa. 543, 198 A.2d 309, 311 (1964); Sloma v. Pfluger, 125 Ill.App. 2d 347, 261 N.E.2d 323, 327 (1970).

14. Restatement (Second) of Agency § 228 comment *d* (1958). We think the factors mentioned in Restatement (Second) of Agency §§ 228, 229 for the most part provide the basis for proper instructions. In regard to the standards of Restatement (Second) of Agency § 228 (1958), we think the following conduct of a serv-

While in the case at bar the facts were undisputed, the jury, applying Restatement criteria, could have reasonably drawn conflicting inferences as to whether Jack was acting in the scope of his employment with Rogers at the time of the accident. Rogers did not expressly require its Anchorage-based employees to commute by automobile to the Twenty Mile Creek jobsite. On the other hand, Jack's employment at this jobsite some 25 miles from his home in Anchorage necessitated his driving to work, since Rogers did not establish a work camp or provide transportation facilities for its employees.[15] Thus, a jury might reasonably infer that Rogers implicitly authorized its employees to commute by automobile and that such commuting was within the scope of Jack's employment.[16] The jury could have reasoned that the additional $8.50 remuneration induced Anchorage-based laborers to commute to Rogers' out-of-town construction project, thus benefitting Rogers. Since the accident occurred during one of these commuting trips, it would not be unfair to require Rogers to pay for the Luths' resulting injuries.[17] On the other hand, the record discloses that Rogers paid its employees the additional $8.50 regardless of whether they commuted to work. Thus, the jury might reasonably infer that the $8.50 was merely a mileage or inconvenience allowance, and that Jack was not on company time while driving home from work. Since Rogers had no right to control Jack's actions after he completed his workday, a jury could have concluded that Jack was not acting within the scope of his employment.[18]

Since there is substantial evidence from which the jury might have found either that Jack was, or was not, acting within the scope of his employment, we conclude that the trial court erred in direct-

---

ant may be considered as indicative that it is within the scope of employment:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 229 (1958) provides:

(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.

(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, had not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) that similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

15. Cf. Short v. United States, 245 F.Supp. 591 (D.Del.1965); Buffat v. Schnuckle, 79 Idaho 314, 316 P.2d 887, 892 (1957).

16. See Restatement (Second) of Agency § 229(1) and comment d (1958).

17. Cf. Hinman v. Westinghouse Elec. Co., 2 Cal.3d 956, 88 Cal.Rptr. 188, 471 P.2d 988, 992 (1970) (relying on employer's payment for travel time as basis for vicarious liability).

18. Cf. Balise v. Underwood, 71 Wash.2d 331, 428 P.2d 573, 577 (1967).

ing a verdict for the Luths on the *respondeat superior*—liability issue.

Our holding as to the *respondeat superior* issue requires that the judgment below be set aside and the matter remanded for a new trial. Nevertheless, we reach the Luths' appeal in order to clarify the proper procedure to be followed regarding verdict reductions.

The automobile Jack was driving at the time of the accident was loaned to him by its owners, John and Freida Knox. Before bringing suit against Rogers in 1967, the Luths executed a covenant not to sue the Knoxes with respect to the accident. The Knoxes paid the Luths $3,500 for the covenant, the Luths stipulating they neither intended to release any other party from liability nor to accept $3,500 as full satisfaction for their injuries. During the trial, Rogers attempted to introduce the covenant into evidence for the avowed purpose of impeaching Anthony Luth's testimony that he had never asserted any claims against another person with respect to the accident. The trial court refused to admit this offered evidence, sustaining objections by Luths' counsel that the covenant was irrelevant to the primary issue—Rogers' vicarious liability. Furthermore, the trial court did not instruct the jury regarding the effect of the $3,500 received by the Luths from the Knoxes under the covenant on Rogers' duty to pay damages. Instead, after the jury returned damage verdicts in the amount of $7,000, the trial court granted Rogers' motion to reduce the damages awarded by $3,500. We conclude that the trial court employed the proper procedure in reducing the damages awarded to the Luths.

 Common law principles are controlling since Alaska's Uniform Contribution Among Tortfeasors Act became effective after the Knox-Luth covenant was executed.[19] A cardinal common law principle establishes that in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered.[20] The doctrine prohibiting double recovery supports the rule that a payment received by the plaintiff for a covenant not to sue someone potentially liable in tort must be deducted from the damages recoverable from persons whose tort liabilities arise out of the same circumstances. This rule is applicable regardless of whether the covenantee, under a covenant not to sue, is a party to the suit.[21]

19. Enacted in 1970, AS 09.16.040(1) provides:
> When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death
> (1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater . . . .

20. *See* Lee v. State, 490 P.2d 1206, 1210–1212 (Alaska 1971); Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 348, 91 S.Ct. 795, 28 L.Ed.2d 77, 97 (1971); Lovejoy v. Murray, 3 Wall. 1, 70 U.S. 1, 17, 18 L.Ed. 129, 134 (1865).

21. *See,. e. g.,* DeLude v. Rimek, 351 Ill. App. 466, 115 N.E.2d 561, 563 (1953); Brandstein v. Ironbound Transp. Co., 112 N.J.L. 585, 172 A. 580 (1934); McCombs v. Stephens, 252 S.C. 442, 166 S.E.2d 814 (1969); Annot. 104 A.L.R. 931 (1934). While this court has never directly applied this rule, we have recognized its existence. Lee v. State, 490 P. 2d 1206, 1211 n. 19 (Alaska 1971); Young v. State, 455 P.2d 889, 893 n. 15 (Alaska 1969).

This rule is consistent with Restatement of Torts § 885(3) (1939), which provides:
> Payments made by one tortfeasor on account of a harm for which he and another are each liable, diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment; the extent of the diminution is the amount of the payment made, or a greater amount if so agreed between the payor and the injured person.

We note that the Restatement does not use the term "joint tortfeasor." In order to trigger the credit principle, it is sufficient that the Luths could have joined the Knoxes as defendants in their suit against Rogers.

The Luths contend that, in the absence of a finding of Knoxes' liability, the $3,500 must be construed as a gratuity. They argue that the payment does not fall within the general rule because a gratuity from a collateral source does not reduce the damage verdict.[22]

██ The Court of Appeals for the District of Columbia Circuit rejected an argument similar to that made by the Luths in the case at bar, stating

[a] settlement made by one potentially liable, but not in fact, is made under Damoclean pressure, not gratuitously.[23]

While no proof of their conduct was submitted to the court, the Knoxes might have been found liable for the accident by knowingly permitting a negligent driver to use their automobile. Though Anthony Luth testified that the Knoxes initiated settlement negotiations, the covenant not to sue

discloses the Knoxes paid the Luths $3,500 in order to secure peace from suit. We therefore find the collateral source rule inapplicable to the factual context presented by this case. Moreover, under the prevailing view, a payment received under a covenant not to sue must be credited to the unreleased tortfeasor even where the person released is found not liable to the plaintiff.[24] We therefore conclude that Rogers has the right to a $3,500 credit against any damages recovered by the Luths.

██ We next turn to the manner by which such credits should be allowed. Courts disagree on whether the underlying facts should be disclosed and instructions given to the jury concerning covenants not to sue in assessing damages,[25] or whether the court ought to allow the credit after the jury, without knowledge of the covenant, returns a damage verdict.[26] Regard-

---

22. The collateral source rule is rooted in the Restatement of Torts § 920(e) (1939) :

*Benefits received from third persons.* The rule stated in this Section does not apply where, although a benefit is received because of the harm, such benefit is the result of the forethought of the plaintiff or of a gift to him by a third person. The plaintiff is not barred from recovery merely because he suffers no net loss from the injury, as where he is insured or where friends make contributions to him because of the loss. If his things are tortiously destroyed, the insurance carrier is subrogated to his position. In other cases the damages which he is entitled to recover are not diminished by the fact that, either as a matter of a contract right or because of gifts, the transaction results in no loss to him. Where a person has been disabled and hence cannot work but derives an income during the period of disability from a contract of insurance or from a contract of employment which requires payment during such period, his income is not the result of earnings but of previous contractual arrangements made for his own benefit, not the tort-feasor's. Likewise, the damages for loss of earnings are not diminished by the fact that his employer or a third person makes gifts to him even though these have been given because of his incapacity. Further, he may be able

to recover for the reasonable value of medical treatment or other services made necessary by the injury although these have been donated to him. (Citation omitted.)

23. Snowden v. D. C. Transit System, Inc., 147 U.S.App.D.C. 204, 454 F.2d 1047, 1049 (1971).

24. *E. g.*, Snowden v. D. C. Transit System, Inc., 147 U.S.App.D.C. 204, 454 F.2d 1047, 1049 (1971) ; Gill v. United States, 429 F.2d 1072, 1078–1079 (5th Cir. 1970) ; Riexinger v. Ashton Co., 9 Ariz. App. 406, 453 P.2d 235, 237 (1969) ; Jacobsen v. Woerner, 149 Kan. 598, 89 P.2d 24, 28 (1939) ; Steger v. Egyud, 219 Md. 331, 149 A.2d 762, 767 (1959) (applying New Jersey law). We note that the Ninth Circuit Court of Appeals recently construed Alaska's Uniform Contribution Among Tortfeasors Act, AS 09.16.040, consistently with the prevailing common law view. Layne v. United States, 460 F.2d 409, 411 (9th Cir. 1972).

25. Cases advocating the "jury method" include Bolton v. Ziegler, 111 F.Supp. 516, 531–532 (D.Iowa 1953) ; Berry v. Kansas City Pub. Serv. Co., 343 Mo. 474, 121 S.W.2d 825, 833–834 (1938).

26. Cases advocating the "court method" include Albrecht v. Broughton, 6 Cal.App. 3d 173, 85 Cal.Rptr. 659, 660–661 (1970) ; DeLude v. Rimek, 351 Ill.App. 566, 115 N.E. 561, 565 (1953) ; Ramsey v. Camp,

ing the "court method" in DeLude v. Rimek, the court stated:

> [I]t is the function of the jury to find the plaintiff's total damages, and the function of the judge, upon application of the defendant after verdict, to find the amount by which such verdict should be reduced by virtue of any covenant made by the plaintiff with another concerned in the commission of the tort.[27]

We prefer the "court method," since the jury method is objectionable from the viewpoint of both defendants and plaintiffs. Though some courts assume that the jury will make the proper reduction,[28] we think that in most cases it will be impossible to determine whether the jury made any credit. Submitting the matter to the jury might prejudice the unreleased defendant, for the jury might imply his negligence from the virtual admission of negligence by the covenantee. The jury method also creates the risk that payment of money for a covenant might be considered evidence of the covenantee's total responsibility for the injury and of the defendant's freedom from fault.[29] And to the extent that the jury method results in uncertainty or inadequate damage verdicts, policies encouraging extrajudicial settlements will be frustrated.

When factual controversies surround a covenant not to sue, such as the covenant's effect on the liability of other tortfeasors or the reapportionment of damages among several tortfeasors, the jury method might be proper.[30] Resolution of factual issues is typically a jury function. However, no substantial question of fact surrounds the Knox-Luth covenant.

We therefore conclude that on remand it will be the jury's function to find the total damages and the court's function, upon Rogers' motion after the verdict, to reduce any damages recovered by the Luths by the $3,500 received under their covenant not to sue the Knoxes.

Reversed and remanded for a new trial in accordance with the foregoing.

ERWIN and FITZGERALD, JJ., did not participate.

CONNOR, Justice (concurring in part and dissenting in part).

I disagree with the holding of the majority opinion that the employer can be held liable on a *respondeat superior* basis for the torts of its employee.

The majority opinion concludes that when conflicting inferences can be drawn from the facts, here undisputed, the question of whether a tortfeasor was acting within the scope of his employment by an employer will be left to jury determination. With that principle I have no quarrel. However, I am not satisfied that the case before us is an appropriate one for the application of that principle.

The problem presented is whether under any view of, or inferences to be drawn from, the undisputed facts of this case, *respondeat superior* liability can be imposed.

The "going and coming" rule, widely accepted in our law, normally absolves the employer of liability for torts committed by his employee while going to or from the place of work. Judicial decision has

---

254 N.C. 443, 119 S.E.2d 209, 211 (1961). *See generally* Annot. 94 A.L.R. 2d 353 (1961).
The Commissioners on Uniform State Laws favor the court method in applying § 4 of the Uniform Contribution Among Tortfeasors Act. 9 U.L.A. 242 (1957). *See also* Layne v. United States, 460 F.2d 409, 411 (9th Cir. 1972) (applying AS 09.16.040).

27. 351 Ill.App. 566, 115 N.E.2d 561, 565 (1953); *followed* Burger v. Van Severen, 39 Ill.App.2d 205, 188 N.E.2d 373, 377 (1963).

28. *E. g.*, Husky Ref. Co. v. Barnes, 119 F. 2d 715, 717 (9th Cir. 1941).

29. *See* DeLude v. Rimek, 351 Ill.App. 566, 115 N.E.2d 561, 565 (1953); Hardin v. New York Central Ry. Co., 145 W.Va. 676, 116 S.E.2d 697 (1960).

30. *Cf.* Lee v. State, 490 P.2d 1206 (Alaska 1971). Several courts note that the "court method" is proper procedure, at least where no factual questions surround the covenant. *E. g.*, Powers v. Temple, 250 S.C. 149, 156 S.E.2d 759 (1967).

developed various exceptions to the rule, most of them covering situations clearly distinguishable from the case before us.

The majority opinion relies on Balise v. Underwood, 71 Wash.2d 331, 428 P.2d 573, 577 (1967), and Hinman v. Westinghouse Electric Co., 2 Cal.3d 956, 88 Cal.Rptr. 188, 471 P.2d 988, 992 (1970). The *Balise* case is in point, if one accepts its underlying premise. There a construction contractor's employee traveled each day to a job site 35 miles from his home. Under the agreement between the contractor and the employee's labor union, he received, in addition to his ordinary pay, an allowance of $4.50 a day. While returning from work on one occasion he was involved as the responsible party in an automobile accident. The trial court, sitting without a jury, found that the employee was not within the course and scope of his employment and that the employer was not vicariously liable. On appeal, the judgment was affirmed. The court found the facts to be susceptible of varying inferences and implications. Accordingly it sustained the trial court's finding.

The opinion in *Balise* makes it apparent that the Washington Supreme Court would have sustained a finding that the employee was within the scope of his employment. Thus, although the result in that case is different from the one at bar, it does stand as authority that the payment of a fixed travel allowance, together with other factors, may be sufficient to bring travel to and from work within the course and scope of employment.

In the *Hinman* case the employee traveled directly from his own home to the job site. Under a contract with the employee's labor union, the employer paid one and one-half hours pay for round-trip travel time, plus $1.30 travel expense. The court held that the employer was liable for automobile injuries caused by the employee while traveling from work.

When one discards the discussion in the *Hinman* case of the traditional "going and coming" rule and its exceptions, the rationale of decision is rather simple. The court reasoned that the employer benefits by being able to reach out into a broad labor market and, through paying for travel time and expense, to induce persons to work for him. By deciding that it is desirable for his enterprise to go beyond the "normal" labor market, the employer should bear and pay for the risks inherent in his decision.

The difficulty with the *Hinman* doctrine is that it seems boundless. One is left in doubt as to what amount of commuting should be considered "normal" in a particular labor market. The travel allowance dealt with in the *Hinman* case arose from a collective bargaining agreement. The amount of the allowance varied by a fixed standard: the distance from the city hall in Los Angeles, California, to the job site. How this standard can have any relationship to reaching outside the "normal" labor market, or to increasing risk of injury to highway users, is never explained. In my opinion, the *Hinman* doctrine so drastically alters the normal "coming and going" rule as to virtually do away with any reliable guide to judicial decision. The rule is based on the employer's surrender of control over his employee once the work day has ended. To say that an exception will be drawn in all instances in which an employee receives a travel allowance, notwithstanding that the employer has no control over the employee during his travel to and from work, is to defeat the very purpose of the rule.

I find more persuasive the reasoning of Lundberg v. State, 25 N.Y.2d 467, 306 N.Y.S.2d 947, 255 N.E.2d 177 (1969). There the employee lived at the job site during the work week, with his living expenses being paid for by the employer. On weekends the employee traveled 80 miles to his home to visit his family. He was paid mileage by his employer for such travel. The court held, as a matter of law, that the employee while traveling was not within the scope of his employment. Accordingly the employer could not be held liable upon a *respondeat superior* basis. The factors emphasized by the

court were that the employee was not driving to satisfy any obligation owed to his employer, that the employer had no control over the movements or activities of the employee, and that the payment of a mileage allowance bestowed no right of control upon the employer. If anything, the facts in *Lundberg* were stronger than those in the case at bar for finding *respondeat superior* liability.

The difficulty with the majority opinion is that it drastically increases the tort liability of employers without providing any coherent or rationalizing principle by which to keep such liability within reasonably predictable bounds.

The activities of the employee, Jack, seem no different from those of commuting employees generally. Jack was not on any special errand for his employer. As a flagman, driving an automobile was not part of the work he was employed to perform. The accident took place outside working hours and several miles away from the job site.

The employer's failure to provide a work camp or to provide transportation for its employees can hardly give rise to liability.[1] The job site apparently was not of the remote type where lodging would be furnished, and it was within commuting distance from Anchorage, the main population center of Alaska.

The main support for the majority opinion is that the payment of $8.50 per day extra remuneration somehow induced Anchorage-based workers to accept employment, thus benefiting the employer. I consider this a very fragile basis for imposing liability. The workers were paid their $8.50 regardless of whether they lived close to or far from the job site. The payment of the $8.50 resulted from the terms of the employer's labor agreement, which required payment upon a uniform basis having nothing to do with where employees actually lived or how far they might commute. I find it most difficult, then, to regard the extra payment as a commuting inducement.

Resting liability on this basis suffers from all of the difficulties mentioned in connection with the *Hinman* case, *supra*.[2] If an exception is to be carved out of the "going and coming" rule because the employer has reached beyond a "normal" labor market, how can the relevant market ever be determined? Should it rest upon the size, location, and nature of the employer's business? Should it be gauged by the kind of employees one would expect to find in such businesses? Must we rely on sociological and traffic engineering studies to determine what constitutes a normal method of getting to work, as contrasted with means so unusual that the employer must be deemed to have induced his workers to commute from a "broad" job market?

Not only do these questions point to the unworkability of the principle, they also highlight the total dearth of information in the record of this case tending to answer such questions.

It is noteworthy that in large industries most labor agreements are negotiated between an organization representing a number of business enterprises and the union. An entrepreneur who belongs to such a management organization has little choice but to accept the labor agreement negotiated on his behalf. Ordinarily, to reject the agreement is simply to go out of business. Hence it is unrealistic to denominate a travel allowance in a collective bargaining agreement an "inducement" for commuting. The existence of a travel allowance in a collective bargaining agreement is often a matter of pure accident. Finally, workers who receive a higher wage scale—

1. The situation here is distinguishable from "remote site" cases where employees are required to live on the premises of the employer, relatively isolated from civilization. See Anderson v. Employers Liability Assur. Corp., 498 P.2d 288 (Alaska 1972), which deals with workmen's compensation for recreational injuries sustained at a remote work site.

2. The majority's reliance on Restatement (Second) of Agency § 229(1) and comment *d* (1958) seems misplaced. That comment concerns situations in which the employer physically supplies a vehicle for his employees' use.

but no travel allowance—may be just as induced to commute as workers who receive a travel allowance but lower hourly wages. In short, basing liability on the presence of a travel allowance would be utterly arbitrary.

Denying the employer's liability in this case does not conflict with our holding in Fruit v. Schreiner, 502 P.2d 133 (Alaska 1972). There we dealt with the activities of an insurance salesman attending a company-sponsored conference where the salesmen were encouraged to have social contacts at places other than the conference headquarters. While returning from the pursuit of such activities to the conference headquarters, one of the salesmen negligently injured the plaintiff. Our holding that the company was liable concerns a factual setting which is obviously distinguishable.

I would hold as a matter of law that Jack was not within the scope of his employment with Rogers & Babler at the time of the accident. Although I would not, therefore, reach the question of reducing the verdict by the amount received from the Knoxes, I do agree with that portion of the opinion which decides that such a reduction must occur.