LAIDLAW TRANSIT, INC., Appellant
and Cross–Appellee,

v.

Gail CROUSE, for and on behalf of her
daughter, Shawn CROUSE, a minor,
Appellee and Cross–Appellant.

Nos. S–9850, S–9869.

Supreme Court of Alaska.

Aug. 30, 2002.

Rehearing Denied Sept. 27, 2002.

Thomas A. Matthews, Thomas L. Hause, Matthews & Zahare, P.C., Anchorage, for Appellant/Cross–Appellee.

Don C. Bauermeister, Burke & Bauermeister, P.L.L.C., Anchorage, for Appellee/Cross–Appellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

A school bus ran off the roadway and rolled over, injuring passenger Shawn Crouse. Shawn's mother sued the bus driver and the driver's employer, Laidlaw Transit, Inc.; a jury awarded Crouse $19,259 in compensatory damages and $3.5 million in punitive damages. The trial court remitted the punitive award to $500,000 and entered judgment for Crouse. Laidlaw appeals, challenging the punitive award and disputing several evidentiary rulings. Crouse cross-appeals, questioning the trial court's remittitur. We affirm, concluding that the trial court correctly found Laidlaw vicariously liable for punitive damages, did not err in its evidentiary rulings, and did not abuse its discretion in its remittitur.

### II. FACTS AND PROCEEDINGS

On November 24, 1992, a school bus driven by Dawn Finitz, a Laidlaw employee, slid off an icy road and rolled over. Shawn Crouse, a bus passenger, suffered minor injuries. In keeping with its drug policy, Laidlaw gave Finitz a post-accident drug test, which revealed that Finitz's blood contained trace amounts of marijuana.

Shawn's mother, Gail Crouse, filed a complaint on behalf of her daughter against Finitz and Laidlaw for compensatory and punitive damages, alleging that Finitz recklessly caused the accident. Crouse claimed that Laidlaw was both vicariously liable for Finitz's conduct because the conduct occurred within the course and scope of Finitz's employment and directly liable because Laidlaw negligently or recklessly hired and/or supervised Finitz—that it knew or should have known that Finitz was likely to drive while under the influence of drugs or alcohol.

In its answer, Laidlaw admitted liability for the accident and confirmed that Finitz tested positive for marijuana. As a result, the only issues for trial were the amount of compensatory damages, whether Finitz's or Laidlaw's conduct was sufficiently outrageous to warrant a punitive damages award, and if so, the amount of that award.

Laidlaw subsequently filed a motion for summary judgment on its liability for punitive damages. The superior court concluded that Laidlaw could not be held directly liable for punitive damages because it had not acted outrageously in hiring and supervising Finitz. But the court ruled that Laidlaw could be held vicariously liable for Finitz's conduct because her actions fell within the course and scope of her employment.

Laidlaw also filed several pretrial motions seeking to exclude certain evidence, including all reference to Finitz's drug use; all evidence of Laidlaw's financial resources; the testimony of Crouse's expert witness, Forest S. Tennant, Jr., M.D.; and all evidence of Laidlaw's conduct. The trial court partially granted the motion to exclude evidence of Laidlaw's conduct, precluding evidence of alcohol and controlled substance abuse by Laidlaw drivers other than Finitz. The court denied Laidlaw's other pretrial motions.

The trial consisted of two phases: the first addressed liability and compensatory damages; the second addressed punitive damages. In the first phase, the jury awarded Crouse $19,259 in compensatory damages and found that Finitz acted sufficiently outrageously to justify an award of punitive damages; in the second phase it awarded $3.5 million in punitive damages.

Laidlaw filed a motion for remittitur, which the trial court granted. Analyzing the punitive damages award in light of the factors in *Norcon, Inc. v. Kotowski,*[1] the trial court concluded that the maximum justifiable award was only $375,000. Crouse moved to reconsider; the trial court granted the motion and increased the punitive damages award to $500,000.

Laidlaw appeals; Crouse cross-appeals.

## III. DISCUSSION

### A. Standard of Review

On appeal, Laidlaw challenges the trial court's summary judgment ruling that it was vicariously liable for punitive damages and also disputes a number of the court's evidentiary rulings. "We review grants of summary judgment de novo and will affirm if there are no genuine issues of material fact...."[2] A trial court's decision regarding the admissibility of evidence, including expert testimony, is generally reviewed for abuse of discretion;[3] but when admissibility turns on a question of law, we apply our independent judgment.[4]

On cross-appeal, Crouse challenges the trial court's remittitur of the punitive damages award from $3.5 million to $500,000. We review a trial court's grant of remittitur for abuse of discretion. To reverse, we must be left with a definite and firm conviction that the trial court erred in granting the remittitur.[5]

### B. Laidlaw's Vicarious Liability for Punitive Damages

In partially denying Laidlaw's summary judgment motion, the trial court ruled that Finitz acted within the course and scope of her employment and, so, if the jury found her conduct sufficiently outrageous to justify an award of punitive damages against Finitz, Laidlaw would be vicariously liable. Laidlaw challenges that ruling.

#### 1. Laidlaw failed to preserve its argument that this court should adopt the complicity rule.

In *Alaskan Village, Inc. v. Smalley,* we adopted the so-called "course of employment rule" for determining when an employer is vicariously liable for punitive damages arising out of its employees' con-

1. 971 P.2d 158 (Alaska 1999).

2. *Municipality of Anchorage v. Repasky,* 34 P.3d 302, 305 (Alaska 2001).

3. *Dobos v. Ingersoll,* 9 P.3d 1020, 1023 (Alaska 2000) (admissibility of evidence); *State v. Coon,* 974 P.2d 386, 398 (Alaska 1999) (expert testimony).

4. *See Landers v. Municipality of Anchorage,* 915 P.2d 614, 616 n. 1 (Alaska 1996).

5. *Int'l Bhd. of Elec. Workers, Local 1547 v. Alaska Util. Constr., Inc.,* 976 P.2d 852, 857 (Alaska 1999).

duct.[6] Under this rule, an employer is vicariously liable, regardless of the employee's rank, so long as the employee was acting within the course and scope of employment.[7]

■ On appeal, Laidlaw urges us to follow a different standard, "the complicity rule," which requires at least some degree of employer complicity before vicarious liability attaches for punitive damages arising from the conduct of a non-supervisory employee.[8] But Laidlaw did not raise this argument at the trial court level. Because Laidlaw failed to preserve the argument for appeal, we decline to consider overruling *Alaskan Village* or adopting the complicity rule.[9]

### 2. The trial court did not err in applying the course of employment rule.

■ Laidlaw next argues that the trial court erred in applying the course of employment rule by deciding as a matter of law that

Finitz had acted within the course and scope of her employment. Because Finitz did not smoke marijuana to serve Laidlaw and because Laidlaw's drug policy "specifically prohibited" drug use, Laidlaw contends, Finitz's conduct "could not have been within the scope of her employment."

But the conduct giving rise to the punitive damages award was not Finitz's act of smoking marijuana; it was her act of driving children in a school bus while she was impaired by marijuana.[10] The issue, then, is whether the trial court erred by concluding that Finitz's act of driving the school bus while under the influence of marijuana fell within the course and scope of her employment.

■ This court does not follow a rigid rule for determining when tortious conduct occurs within the scope of employment; rather, we apply "a flexible, multi-factored

6. 720 P.2d 945, 948–49 (Alaska 1986) ("[I]f a tort by an employee renders the employer liable for compensatory damages and the employee's actions justify a punitive damage award, then the employer is liable for punitive damages, whether or not the employer authorized or ratified the tortious conduct.") (citing with approval the rule adopted by the Oregon Supreme Court in *Stroud v. Denny's Rest., Inc.*, 271 Or. 430, 532 P.2d 790, 793 (1975)); *see also VECO, Inc. v. Rosebrock*, 970 P.2d 906, 911 (Alaska 1999) (noting that Alaska case law generally follows the Restatement (Second) of Agency but has eliminated the requirement in subsection (c) that the employee be managerial).

7. *See Stroud v. Denny's Rest., Inc.*, 271 Or. 430, 532 P.2d 790, 792–93 (1975).

8. The complicity rule is expressed by the Restatement (Second) of Torts § 909 (1979) and the nearly identical Restatement (Second) of Agency § 217C (1958), which states:
 Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:
 (a) the principal authorized the doing and the manner of the act, or
 (b) the agent was unfit and the principal was reckless in employing him, or
 (c) the agent was employed in a managerial capacity and was acting within the scope of employment, or
 (d) the principal or a managerial agent of the principal ratified or approved the act.

9. *See, e.g., Nenana City Sch. Dist. v. Coghill*, 898 P.2d 929, 934 (Alaska 1995) (declining to consid-

er an argument raised for the first time on appeal). Laidlaw suggests that this court recently adopted the complicity rule in *VECO, Inc. v. Rosebrock*, 970 P.2d 906 (Alaska 1999)—a case decided after trial ended in the present case— and that the newly created conflict between *VECO* and *Alaskan Village* must be resolved. But Laidlaw misreads *VECO*, which expressly reaffirmed *Alaskan Village* as establishing the appropriate vicarious liability test for cases involving conduct within the course and scope of employment but adopted the complicity rule for cases involving employee conduct *outside* the course and scope of employment. *VECO*, 970 P.2d at 923 & n. 34. After our decision in *Alaskan Village*, the legislature undertook to regulate and narrow the circumstances in which punitive damages may be awarded and to limit the amount of such awards. *See* AS 09.17.020. Further, the Supreme Court of the United States has indicated that punitive damages are subject to review for excessiveness under the due process clause of the fourteenth amendment to the United States Constitution. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). In light of these developments, the *Alaskan Village* rule may be anachronistic. If and when the point is properly preserved and raised, this court may consider adopting the narrower complicity rule.

10. *See Stephenson v. United States*, 771 F.2d 1105, 1107 (7th Cir.1985) (relying on Wisconsin law to say that "it is the employee's conduct *at the time of the accident* that determines whether he is acting within the scope of his employment").

test."[11] We have generally looked to the various factors in the Restatement (Second) of Agency § 228 as "relevant considerations," though not prerequisites, to determine whether an employer should be held responsible for an employee's acts.[12] The Restatement (Second) of Agency § 228 provides:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpected by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Applying these factors to this case, we conclude that the trial court properly found as a matter of law that Finitz's outrageous conduct occurred in the course and scope of her employment.

▮ First, Finitz had specifically been employed to drive a school bus. That she performed this activity while under the effects of marijuana does not mean that she acted outside the scope of her employment; instead, it demonstrates the recklessness with which she performed her assigned task.[13] Moreover, the fact that Laidlaw policy explicitly prohibits smoking marijuana does not insulate the company from liability: "A wrongful act committed by an employee while acting in his employer's business does not take the employee out of the scope of employment, even if the employer has expressly forbidden the act."[14]

Second, the disputed conduct occurred within the time and space limits of Finitz's employment. Finitz drove under the influence of marijuana while on her usual morning route.

Finally, even though Finitz acted recklessly in driving the bus, she nonetheless acted, at least in part, to serve Laidlaw. In *Doe v. Samaritan Counseling Center,* we held that "where tortious conduct arises out of and is reasonably incidental to the employee's legitimate work activities, the 'motivation to serve' test will have been satisfied."[15] Here the conduct at issue—driving while impaired by marijuana—both arose out of and was incidental to Finitz's legitimate work activities because it carried out the very function that Finitz was hired to perform—driving a school bus. We thus affirm the superior court's decision.

### C. Evidentiary Issues

1. **The trial court did not err by admitting evidence regarding Laidlaw's failure to locate a driver named "Mike."**

▮ During the trial's liability phase, Crouse introduced evidence over Laidlaw's

---

11. *Doe v. Samaritan Counseling Ctr.,* 791 P.2d 344, 346 (Alaska 1990).

12. *Id.* at 347; *accord Williams v. Alyeska Pipeline Serv. Co.,* 650 P.2d 343, 349 (Alaska 1982); *Luth v. Rogers & Babler Constr. Co.,* 507 P.2d 761, 764 & n. 14 (Alaska 1973) (rejecting proposition that must satisfy each factor).

13. *See Gutierrez de Martinez v. Drug Enforcement Admin.,* 111 F.3d 1148, 1158 (4th Cir. 1997) (applying Virginia law and concluding that "drinking alcohol by itself does not remove the employee from the scope of his employment"); *Stephenson,* 771 F.2d at 1107–08 ("[T]he fact that [the employee] was intoxicated when driving does not mean that he was acting outside the scope of his employment, but only that he failed to use reasonable care under the circumstances.").

14. *Ortiz v. Clinton,* 187 Ariz. 294, 928 P.2d 718, 723 (App.1996); *accord Stephenson,* 771 F.2d at 1108 ("The [employer] cannot insulate itself from liability ... by promulgating regulations prohibiting employees from drinking and driving."); *Pyne v. Witmer,* 159 Ill.App.3d 254, 111 Ill.Dec. 452, 512 N.E.2d 993, 999 (1987) (holding that employee's violation of his employer's policy against drinking on the job does not preclude liability under respondeat superior).

15. 791 P.2d 344, 348 (Alaska 1990), *clarified by VECO, Inc. v. Rosebrock,* 970 P.2d 906, 924 n. 36 (Alaska 1999) (disapproving of possible broad interpretation and requiring employee's act to have at least some motivation to serve corporation).

objection that Laidlaw had failed to identify and locate a Laidlaw driver who was known to Finitz only as "Mike." Finitz asserted that she and Mike had previously smoked marijuana together. On appeal, Laidlaw claims that whether it ever found Mike was irrelevant to whether Finitz's marijuana use impaired her driving on the day of the accident. Moreover, Laidlaw points out, the trial court had previously ruled that evidence concerning drug and alcohol use by Laidlaw drivers other than Finitz was irrelevant and thus inadmissable.

Laidlaw adopted the theory at trial that Finitz was merely an occasional, "recreational" marijuana user and that the jury could therefore believe her assertion that she had not smoked marijuana on the day of the accident. This theory was based in large part on Finitz's testimony that while she was working for Laidlaw she smoked marijuana "[v]ery irregularly, very seldom." Given Laidlaw's affirmative reliance on the theory that Finitz was a recreational user, Crouse obviously had a legitimate interest in locating witnesses who were familiar with Finitz's drug use and might be able to shed light on the credibility of her testimony.

During pretrial discovery and at trial, Finitz named only two people with whom she had smoked marijuana in the past: Cora, a resident in Finitz's apartment complex, and Mike. She could not recall either Cora's or Mike's last names. As Crouse points out, "[p]laintiff repeatedly sought through discovery identifying information about Cora and Mike because these were the only witnesses [Finitz] could even recall the first name of who had knowledge of her claimed 'recreational' marijuana use." Because Cora had moved and was no longer in contact with Finitz, the only way Crouse could verify Finitz's testimony on this point was through Mike. But Laidlaw failed to locate Mike, claiming that, despite an "extensive inquiry," it had failed to find anyone named Mike who worked as a Laidlaw driver in Eagle River at the time of the accident.

By establishing Laidlaw's failure to locate Mike and questioning the reasonableness of Laidlaw's efforts, Crouse legitimately sought to demonstrate not only the absence of any- one who could corroborate Finitz's claim of merely occasional drug use, but also that Laidlaw might have been less than diligent in uncovering evidence that could contradict its "recreational" user theory. Because the disputed evidence had at least some legitimate tendency to refute Laidlaw's theory of defense, we reject Laidlaw's claim of irrelevance and conclude that the trial court did not abuse its discretion in admitting the evidence.

**2. The trial court did not err by refusing to give a cautionary instruction after Crouse's closing argument.**

 Laidlaw claims that even if we find that the trial court properly admitted the evidence concerning Mike, it nonetheless erred by failing to give a cautionary instruction after Crouse referred to this evidence during closing arguments. In closing argument, Crouse's attorney stated,

> But Laidlaw not finding out who Mike was is detestable. It's one of their drivers, he's smoking marijuana with this driver.
>
> . . . .
>
> We're going to ask you to say Laidlaw shouldn't be using drivers like Mike. Now you've never seen Mike and I've never seen Mike, and Mike might still be driving, for all of us know. If you do nothing in this case, you do nothing, then tomorrow morning, when that bus pulls up and those doors open, and a child looks up those big stairs and climbs into the bus, Mike may well be behind that steering wheel. And that's who you're going to leave there. And if you think this is okay, then you say no to these questions. But if you're worried about that child and you're worried about this type of conduct, then your answers have to be yes in this action. And that's the biggest decision you're going to make in this case.

 Following these statements, Laidlaw requested a cautionary instruction to explain that Laidlaw's conduct was irrelevant. The trial court denied this request, reasoning that the argument was relevant to the issue of deterrence. We agree with the trial court's

conclusion. Jury instruction 18 stated: "The Plaintiff has also requested that you find Defendant, Dawn Finitz, liable for punitive damages in order to punish her and to deter her and others from repeating similar acts." Laidlaw did not object to this instruction. As we have stated on other occasions, "the purpose of punitive damages is to punish the wrongdoer and prevent similar conduct in the future."[16] The argument at issue was based on evidence presented at trial, conformed to the jury instructions, and was aimed at convincing the jury of the need to deter other drivers and employers who were similarly situated to Finitz and Laidlaw. We conclude that the trial court did not err in refusing Laidlaw's request for a cautionary instruction.

### 3. The trial court did not err by admitting evidence of Laidlaw's wealth.

■ The trial court denied Laidlaw's pretrial motion to exclude all evidence of the company's financial resources, reasoning that Laidlaw's financial wealth was relevant to the punitive damages question. Laidlaw challenges this ruling, arguing that evidence of corporate wealth is irrelevant when, as here, a company commits no direct wrong but is subject to punitive damages solely on the theory that it is vicariously liable for acts of a non-managerial employee. Except perhaps in situations involving managerial employees, Laidlaw reasons, a vicariously liable employer is not a wrongdoer, and financial evidence therefore must be limited to the employee's resources.

■ We have previously recognized that a defendant's wealth is usually relevant to the issue of punitive damages.[17] But we have not yet considered the narrower issue raised here: whether a corporate employer's financial resources are relevant to punitive damages when the employer is only vicariously liable for an employee's conduct. The rationale behind the course of employment rule we adopted in *Alaskan Village v. Smalley* requires an affirmative answer.[18]

The course of employment rule holds corporate employers vicariously liable for punitive damages on the theory that corporations can act only through their employees and agents; hence, when employees act in the course of employment, their acts are indistinguishable from corporate actions. An early opinion of the Maine Supreme Court exemplifies this theory:

> A corporation is an imaginary being. It has no mind but the mind of its servants; it has no voice but the voice of its servants; and it has no hands with which to act but the hands of its servants. All its schemes of mischief, as well as its schemes of public enterprise, are conceived by human minds and executed by human hands; and these minds and hands are its servants' minds and hands. All attempts, therefore, to distinguish between the guilt of the servant and the guilt of the corporation; or the malice of the servant and the malice of the corporation; or the punishment of the servant and the punishment of the corporation, is sheer nonsense.[19]

Under the course of employment rule, then, an employee acting within the course and scope of employment essentially is a corporate actor; and when the employee acts wrongfully, the corporation becomes the wrongdoer: "[T]he tortious act of the servant done in the course of his employment is ordinarily the legal act of the master, and in this sense, the employer is not free of

---

**16.** *Alaskan Village, Inc. v. Smalley,* 720 P.2d 945, 948 (Alaska 1986).

**17.** *Norcon, Inc. v. Kotowski,* 971 P.2d 158, 175 (Alaska 1999).

**18.** 720 P.2d at 948–49.

**19.** *Goddard v. Grand Trunk Rwy.,* 57 Me. 202, 222–23 (1869), *as quoted in Embrey v. Holly,* 293 Md. 128, 442 A.2d 966, 970 (1982) (quoting this language as justification for following the course of employment approach); *see also Miller v. Blanton,* 213 Ark. 246, 210 S.W.2d 293, 297 (1948) ("Having, by the constitution of their being, to act solely by agents or servants, [corporations] must, as matter of sound public policy, be held liable for all the acts of their agents and servants who commit wrongs while performing the master's business, and in the scope of their employment; and this to the extent of liability for punitive damages in proper cases.").

'fault.' "[20] Because the law treats the employer and employee alike as wrongdoers, it is proper for the jury to consider what amount of punitive damages will suffice to punish and motivate the vicariously liable employer; as other jurisdictions have held in applying the course of employment rule, evidence of the employer's financial wealth is relevant and admissible in these circumstances.[21] The trial court did not abuse its discretion in admitting evidence of Laidlaw's financial wealth.

4. **The trial court did not err by admitting the testimony of Dr. Tennant.**

Laidlaw next contends that the trial court erred in allowing Crouse's medical expert witness, Dr. Forest Tennant, to state his opinion that, at the time of the accident, Finitz was under the influence of marijuana she had smoked earlier the same morning. But Laidlaw did not object to the challenged testimony and therefore failed to preserve this issue for appeal.[22]

Laidlaw did file a pretrial motion to prevent Dr. Tennant from expressing his expert opinion concerning a different theory of impairment: that Finitz was a long-term, heavy user of marijuana; that such use can cause residual physiological effects; and that Finitz's driving was probably impaired by these residual effects on the morning of the accident. But despite the trial court's pretrial ruling allowing testimony on this theory of impairment, Dr. Tennant did not rely on the theory at trial. He testified instead that, in

his opinion, Finitz had likely smoked marijuana on the morning of the accident and was impaired by the effects of that morning's consumption.

Laidlaw voiced no objection to this testimony, instead choosing to cross-examine Dr. Tennant about his reasons for failing to mention this theory earlier. The doctor had acknowledged that he had just reached his conclusion the night before testifying, after examining emergency room records that he had not previously reviewed and that disclosed Finitz's post-accident pulse rate and blood pressure. According to Dr. Tennant, this information enabled him to form his new opinion; before seeing the emergency room records, he had relied on information indicating that Finitz's most recent marijuana use had occurred at least several days before the accident.

As can be seen, Dr. Tennant's trial testimony addressed a different theory than the theory he developed during pretrial discovery, and the new testimony obviously fell outside the scope of both Laidlaw's pretrial motion to preclude Dr. Tennant's expert testimony concerning residual effects and the superior court's pretrial order denying that motion.[23] The record provides no basis, then, for concluding that the court had already ruled the new line of testimony admissible or that a contemporaneous objection would have been futile. Given these circumstances, Laidlaw cannot reasonably rely on its pretrial motion as a timely objection; nor can it plausibly invoke the superior court's

20. *Embrey,* 442 A.2d at 970; *see also, e.g., Goddard,* 57 Me. at 222–23; *Thorne v. Contee,* 80 Md.App. 481, 565 A.2d 102, 110 (1989) ("[T]he tortious act of the servant done in the course of his employment is ordinarily the legal act of the master."); *Gifford v. Evans,* 35 Mich.App. 559, 192 N.W.2d 525, 529 (1971) ("Respondeat superior provides in essence that the act of an employee during the course of his employment is legally the act of the employer.").

21. *See Embrey,* 442 A.2d at 973 (holding that it was appropriate for trial court to award separate punitive damages awards against an employee and his vicariously liable employer because this would enable each award to be based on the two defendants' differing financial status); *see also Hyatt Regency Phoenix Hotel Co. v. Winston &*

*Strawn,* 184 Ariz. 120, 907 P.2d 506, 521 (App. 1995) (holding that punitive damages award against vicariously liable law firm was not excessive in part because "[t]he award is proportionate to [the law firm's] financial position").

22. *See* Alaska Evidence Rule 103(a)(1); *see also Norcon, Inc.,* 971 P.2d at 170 (holding that employer waived issue on appeal of whether employee's testimony was unduly prejudicial by failing to object when testimony was offered at trial).

23. At trial Laidlaw did not object to Dr. Tennant's new theory as beyond the scope of the expert disclosures or report and Laidlaw does not complain of such a discovery violation on appeal.

pretrial ruling as an excuse for failing to make a contemporaneous objection.

### 5. The trial court did not err by admitting evidence of Finitz's general drug habit.

■ Laidlaw argues that the trial court erred in admitting evidence of Finitz's general drug use, particularly certain post-accident treatment records from the Alaska Women's Resource Center indicating that Finitz had used marijuana on a daily basis. Laidlaw insists that evidence of Finitz's general drug use was inadmissible because Crouse presented no admissible evidence tending to prove that Finitz was actually impaired by drugs at the time of the accident.[24]

But as explained above, Dr. Tennant testified that Finitz was impaired by marijuana when the accident occurred. The challenged treatment records directly supported this testimony: they reflected Finitz's own admissions that she engaged in daily marijuana use around the time the accident occurred. The Center's client intake form states that Finitz had been taking "6 hits" of marijuana twice a day. Because Finitz's admission of daily use had case-specific relevance by discrediting her claim of occasional recreational use and by indicating that she smoked marijuana on the day she drove the school bus off the road, we find no error in failing to exclude the records as general propensity evidence.

### D. The Trial Court Did Not Abuse Its Discretion by Ordering a Remittitur of the Punitive Damages Award.

■ On cross-appeal, Crouse challenges the trial court's remittitur of the punitive damages award from $3.5 million to $500,000. A trial court may remit a jury's punitive damages award as excessive when the court determines that the award is "man-

ifestly unreasonable"; factors relevant to this determination "include the compensatory damage amount, magnitude of the offense, importance of the policy violated, and the defendant's wealth."[25] Also relevant are the nine factors listed in the Model Punitive Damages Act:[26]

(1) the nature of the defendant's wrongful conduct and its effect on the claimant and others;

(2) the amount of compensatory damages;

(3) any fines, penalties, damages, or restitution paid or to be paid by the defendant arising from the wrongful conduct;

(4) the defendant's present and future financial condition and the effect of an award on each condition;

(5) any profit or gain, obtained by the defendant through the wrongful conduct, in excess of that likely to be divested by this and any other actions against the defendant for compensatory damages or restitution;

(6) any adverse effect of the award on innocent persons;

(7) any remedial measures taken or not taken by the defendant since the wrongful conduct;

(8) compliance or noncompliance with any applicable standard promulgated by a governmental or other generally recognized agency or organization whose function is to establish standards; and

(9) any other aggravating or mitigating factors relevant to the amount of the award.[27]

When a trial court applies these factors and concludes that an award is excessive, the amount remitted should reflect the maximum that the jury could have awarded without being excessive.[28]

---

24. Laidlaw cites other courts for support. *See, e.g., Coleman v. Williams*, 42 Ill.App.3d 612, 1 Ill.Dec. 268, 356 N.E.2d 394, 397 (1976) (denying reference to party's alcohol consumption earlier in day when no evidence existed that at time of accident party was actually intoxicated); *Gustavson v. Gaynor*, 206 N.J.Super. 540, 503 A.2d 340, 342–43 (1985) (same).

25. *Norcon, Inc.*, 971 P.2d at 175 (internal quotations omitted) (quoting *Alaskan Village, Inc. v. Smalley*, 720 P.2d 945, 949 (Alaska 1986)).

26. *Id.* at 176.

27. Model Punitive Damages Act (U.L.A.) § 7(a), *quoted in Norcon, Inc.*, 971 P.2d at 176.

28. *Norcon, Inc.*, 971 P.2d at 175.

The offensive conduct in this case was Finitz's act of driving a school bus off the road while Finitz was impaired by marijuana. In its original order of remittitur, the trial court focused on several relevant factors: (1) the relationship between the punitive and compensatory damages awards; (2) the offense's magnitude; (3) the importance of the policy violated; (4) the defendant's wealth; and (5) any fines, penalties, damages, or restitution paid or to be paid by Laidlaw. While recognizing that Laidlaw had over $1 billion in annual revenues nationwide, the court emphasized that the jury's award of punitive damages exceeded its award of compensatory damages by 182 times; moreover, the court noted, although Finitz violated a serious policy by driving under the influence of a controlled substance, her wrongful conduct was not especially egregious, consisting of an isolated act that caused only minor injuries. This analysis initially led the court to reduce the jury's $3.5 million punitive damages award to $375,000, a figure that, in the court's view, represented the maximum punitive damages award supported by the evidence.

After Crouse moved for reconsideration, the trial court increased the remitted award to $500,000 based on a reevaluation of two factors: the offense's magnitude and Laidlaw's wealth. In reassessing these factors, the court found Finitz's conduct to be more serious than it originally believed, noting that, despite Shawn Crouse's relatively minor injuries, "an out of control school bus, full of school children on an icy road, with an impaired driver posed a very high degree of hazard to the occupants of the school bus and to the public." At the same time, however, the court tempered its original estimate of Laidlaw's corporate wealth, pointing out that, although the company's nationwide annual revenues exceeded $1 billion, its annual revenues in Alaska totaled only $5 million. Finding statewide revenues relevant, the court reasoned that a $3.5 million award might seem *de minimis* compared to Laidlaw's nationwide revenues but was obviously excessive in relation to the company's Alaska revenues. Because this second factor largely offset the first, the court decided on reconsideration to raise the original remitted award by only a modest amount, to $500,000.

■ In challenging the remittitur, Crouse's cross-appeal advances three arguments. First, Crouse argues, the remittitur is inconsistent with the trial court's finding on reconsideration that the jury's punitive damages award is *de minimis* compared to Laidlaw's nationwide revenues. But this argument misreads the court's reconsideration decision, which acknowledged Laidlaw's nationwide earnings but essentially found the company's much smaller Alaska revenues to be a more realistic point of reference for assessing the excessiveness of the punitive damages verdict. Punitive damages are meant to punish the wrongdoer and to deter similar conduct.[29] Given the localized nature of the misconduct at issue, the limited scope of the resulting harm, and the absence of any direct liability, the trial court did not abuse its discretion in selecting Laidlaw's statewide operations as the most appropriate measure to use in determining the need for deterrence and punishment.

Second, Crouse argues that, given the court's findings on reconsideration concerning the magnitude of Finitz's misconduct, its ultimate decision overemphasized the mathematical ratio of punitive damages to compensatory damages—a measure that should not alone be dispositive. But again, Crouse misreads the trial court's order on reconsideration. Although the trial court's findings on reconsideration acknowledged that Finitz's misconduct was more serious than the court originally thought, these findings neither said nor suggested that the misconduct was so serious as to support the original $3.5 million punitive damages verdict. Instead, the court's reconsideration decision simply recognized that the enhanced seriousness of the misconduct supported an award larger than the $375,000 total that the court had awarded in its original remittitur order. As the trial court specifically noted, even though it originally underestimated the potential hazard posed by Finitz's conduct, the overall seriousness of the misconduct continued to be

29. *Alaskan Village,* 720 P.2d at 948.

mitigated by several significant considerations: to a large extent the potential harm from Finitz's conduct did not materialize; Shawn Crouse suffered only minor injuries; and Laidlaw itself neither contributed to Finitz's misconduct nor directly engaged in any other wrongdoing. Moreover, Crouse's argument on this point mistakenly posits that the trial court's order on reconsideration found the ratio of punitive to compensatory damages to be the only mitigating factor calling for a remittitur. As already indicated, the court independently emphasized that "the income and size of [Laidlaw's] Alaska operations must temper [the amount awarded]."

Last, Crouse attempts to establish the appropriateness of the jury's punitive damages verdict through a detailed discussion of economic efficiency theory. But Crouse failed to present any evidence at trial supporting this theory, failed to argue the point to the jury or to request supporting instructions, and failed to argue this point before the superior court—either in its opposition to Laidlaw's motion for remittitur or in its motion for reconsideration. Because a party may not present new issues or advance new theories to secure a reversal of a trial court decision, we decline to consider Crouse's economic efficiency theory.[30]

We thus reject Crouse's principal claim on cross-appeal, holding that the trial court did not abuse its discretion in ordering a remittitur of the punitive damages award from $3.5 million to $500,000.[31]

## IV. CONCLUSION

We AFFIRM the superior court's final judgment.

---

**30.** *See Nenana City Sch. Dist. v. Coghill,* 898 P.2d 929, 934 (Alaska 1995) ("[A]n argument not raised in a suit before the trial court will not be considered on appeal."); *see also Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985) (noting that court may review an issue if new argument is closely related to trial court arguments so that they "could have been gleaned" from the pleadings).

**31.** Crouse also raises several other cross-appeal issues for consideration only if we grant Laidlaw's request for a new trial. Our decision rejecting Laidlaw's arguments on appeal makes it unnecessary to consider Crouse's contingent cross-appeal issues.